UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4 | 8 | 09
```

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

**OPINION & ORDER**

**02 MDL 1499 (SAS)**

-------------------------------------------------------- X

**This Document Relates to:**

-------------------------------------------------------- X

LUNGISILE NTSEBEZA, *et al.*,

        Plaintiffs,

   - against -

DAIMLER AG, *et al.*,

        Defendants.

**02 Civ. 4712 (SAS)**
**02 Civ. 6218 (SAS)**
**03 Civ. 1024 (SAS)**

-------------------------------------------------------- X

KHULUMANI, *et al.*,

        Plaintiffs,

   - against -

BARCLAYS NATIONAL BANK LTD., *et
al.*,

        Defendants.

**03 Civ. 4524 (SAS)**

-------------------------------------------------------- X

## TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.    Core Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.    Procedural Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        A.    Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        B.    The Alien Tort Claims Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.     EXTRATERRITORIALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.      RECOGNIZED TORTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              1.    Recognition of Torts Under the Law of Nations  . . . . . . . . . . 19
              2.    Corporate Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              1.    Apartheid by a Non-State Actor . . . . . . . . . . . . . . . . . . . . . . 24
              2.    Arbitrary Denationalization by a State Actor . . . . . . . . . . . . 28
              3.    Cruel, Inhuman, or Degrading Treatment  . . . . . . . . . . . . . . 31
              4.    Corporate Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VI.     SECONDARY LIABILITY STANDARDS . . . . . . . . . . . . . . . . . . . . . . . 36
        A.    Source of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        B.    Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
              1.    *Actus Reus* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
              2.    *Mens Rea*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        C.    Conspiracy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

VII.    SPECIFIC AIDING AND ABETTING CLAIMS  . . . . . . . . . . . . . . . . . . 55
        A.    The *Ntsebeza* Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
              1.    The Automotive Defendants  . . . . . . . . . . . . . . . . . . . . . . . . 56
              2.    International Business Machines Corporation . . . . . . . . . . . 59
              3.    Barclays Bank PLC  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
        B.    The *Khulumani* Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

|  | 1. | Automotive Defendants | 63 |
|  | 2. | The Technology Defendants | 67 |
|  | 3. | Banking Defendants | 70 |
|  | 4. | Rheinmetall Group A.G. | 71 |

| VIII. | ALTER-EGO AND AGENCY | | 73 |
| A. | Applicable Law | | 74 |
|  | 1. | Piercing the Corporate Veil | 75 |
|  | 2. | Corporate Agency | 77 |
| B. | Discussion | | 80 |
|  | 1. | Piercing the Corporate Veil | 81 |
|  | 2. | Corporate Agency | 82 |

| IX. | PRUDENTIAL DOCTRINES | | 87 |
| A. | Factual Background | | 87 |
|  | 1. | United States Government Statements | 88 |
|  | 2. | South African Government Statements | 90 |
|  | 3. | Statements by TRC Commissioners | 93 |
| B. | Applicable Law | | 97 |
|  | 1. | Case-Specific Deference | 97 |
|  | 2. | Political Question Doctrine | 100 |
|  | 3. | International Comity | 102 |
| C. | Discussion | | 105 |
|  | 1. | Political Question | 105 |
|  | 2. | Comity | 108 |
| D. | Re-Soliciting Governmental Views | | 111 |

| X. | STATUTE OF LIMITATIONS | | 111 |
| A. | Applicable Law | | 113 |
|  | 1. | Equitable Tolling | 113 |
|  | 2. | Relation Back | 118 |
|  | 3. | *American Pipe* Tolling | 121 |
| B. | Discussion | | 122 |
|  | 1. | Equitable Tolling | 122 |
|  | 2. | Relation Back and *American Pipe* Tolling | 123 |

XI.   STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
      A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
      B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

XII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

> *The truth about apartheid – about its causes and effects . . .*
> *about who was responsible for its maintenance – continue*
> *to emerge.   This litigation is one element of that*
> *emergence.*

> — Archbishop Desmond Tutu and
> Commissioners of the Truth and
> Reconciliation Commission of South
> Africa[1]

## I.   INTRODUCTION

Two actions brought on behalf of massive classes of South Africans

("plaintiffs") assert that several multinational corporations ("defendants") aided

and abetted torts in violation of customary international law.  Plaintiffs claim

jurisdiction in United States courts under the Alien Tort Claims Act ("ATCA").[2]

These lawsuits address the obligations of corporations under the law of nations,

the role of American courts in enforcing universal norms of international law, and

the legacy of South African apartheid.

After more than six years of litigation, defendants have filed a second

---

[1]   Brief of Amici Curiae Commissioners and Committee Members of
South Africa's Truth and Reconciliation Commission in Support of Appellants in
*Khulumani* ("TRC Br.") at 13-14, *reproduced at* Plaintiffs' Appendix ("Pl. App.")
235.

[2]   28 U.S.C. § 1350.  This provision is alternatively known as the Alien
Tort Statute ("ATS").

1

consolidated motion to dismiss these actions in their entirety. Plaintiffs have filed

a motion to re-solicit the views of the Governments of the United States and South

Africa concerning this litigation. For the reasons that follow, defendants' motion

to dismiss is granted in part and denied in part. Plaintiffs' motion to re-solicit the

views of the governments is denied.

## II.    BACKGROUND

### A.    Core Allegations

The crimes of the apartheid regime that governed South Africa from

1948 to 1994 are well documented.[3] Beginning in the late 1940s, the South

African Government instituted a separation of the races, starting with

classification[4] and anti-miscegenation laws[5] and proceeding swiftly to geographic

segregation.[6] In 1951, passage of the Bantu Authorities Act created "homelands"

---

[3]     *See, e.g.*, Comprehensive Anti-Apartheid Act, 22 U.S.C. § 5011, *repealed by* South African Democratic Transition Support Act of 1993, 22 U.S.C. § 5001 note (describing apartheid policies that the United States directly opposed). *See also* 22 U.S.C. § 5020(a)(1), *repealed by* 22 U.S.C. § 5001 note ("The Congress finds that the policy of apartheid is abhorrent and morally repugnant.").

[4]     *See* Population Registration Act 30 of 1950 (S. Afr.).

[5]     *See* Prohibition of Mixed Marriages Act 55 of 1949 (S. Afr.); Immorality Amendment Act 21 of 1950 (S. Afr.).

[6]     *See* Group Areas Act 41 of 1950 (S. Afr.). *See also* Reservation of Separate Amenities Act 49 of 1953 (S. Afr.).

2

that were eventually labeled distinct nations.[7]  Black South Africans were forcibly

removed to bantustans created by this Act then stripped of their South African

citizenship.[8]  Resistance to these policies led to violent state repression beginning

with the Sharpesville Massacre of March 21, 1960, continuing through the Soweto

Uprising of 1976 and conflicts between the apartheid government and resisters

that stretched through the 1980s.[9]  Moreover economic,[10] political,[11] and

educational[12] aspects of apartheid led to the full-scale disenfranchisement and

marginalization of the majority of the South African population.  Plaintiffs allege

that defendants – through both their direct practices and the provision of

---

[7]     *See* Bantu Authorities Act 68 of 1951 (S. Afr.).

[8]     *See* Bantu Homelands Citizenship Act 26 of 1970 (S. Afr.).  The
bantustans were majority-black territories carved out of South Africa and declared
independent countries.  "No country, other than South Africa, recognized these
territories as independent states."  Complaint, *Ntsebeza v. Daimler A.G.*
("*Ntsebeza* Complaint") ¶ 47.

[9]     *See Ntsebeza* Complaint ¶¶ 42, 49-50.

[10]    *See, e.g.*, Bantu Building Workers Act 27 of 1951 (S. Afr.); Native
Labour (Settlement of Disputes) Act 48 of 1953;

[11]    *See, e.g.*, Separate Representation of Voters Act 46 of 1951 (S. Afr.);
South Africa Act Amendment Act 9 of 1956 (S. Afr.); Separate Representation of
Voters Amendment Act 50 of 1968 (S. Afr.); Bantu Investment Corporation Act
34 of 1959 (S. Afr.).

[12]    *See, e.g.*, Extension of University Education Act 45 of 1959 (S. Afr.).

3

substantial assistance to the apartheid regime – bear some measure of responsibility for the crimes that pervaded that dark era in South African history.

Plaintiffs in the first action, *Ntsebeza v. Daimler A.G.* ("*Ntsebeza* plaintiffs"), allege that they suffered discriminatory employment practices, employment retaliation for political beliefs, geographic segregation, arbitrary arrest and detention, torture, forced exile, arbitrary denationalization, and the extrajudicial killing of family members.[13] The *Ntsebeza* plaintiffs bring a class action on behalf of "themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries" as a result of defendants' direct and secondary violations of the law of nations.[14]

Plaintiffs in the second action, *Khulumani v. Barclays National Bank Ltd.* ("*Khulumani* plaintiffs"), include both Khulumani – a South African organization that "works to assist victims of apartheid-era violence" – and individuals who suffered geographic segregation, arbitrary arrest and detention,

---

[13]     *See Ntsebeza* Complaint ¶¶ 16-28.

[14]     *Id.* ¶ 149.

4

rape, torture, and the extrajudicial killing of family members.[15]   The *Khulumani* plaintiffs bring a class action on behalf of four distinct classes:

- An "extrajudicial killing class" of all surviving personal representatives of persons who were subject to extrajudicial killing by South African security forces between 1960 and 1994;

- A "torture class" of all persons who were subject to torture and rape by South African security forces between 1960 and 1994;

- A "detention class" of all persons who were subject to prolonged unlawful detention by South African security forces between 1960 and 1994; and

- A "cruel treatment class" consisting of all persons who were subject to cruel, inhuman, and degrading treatment by South African security forces between 1960 and 1994.[16]

Defendants Daimler A.G., Ford Motor Company, and General Motors Corporation ("GM") (collectively "the automotive defendants") are multinational automotive companies headquartered in Stuttgart, Germany; Dearborn, Michigan;

---

[15]     *See* Complaint, *Khulumani v. Barclays Nat'l Bank Ltd*. (*"Khulumani* Complaint ") ¶¶18-31.

[16]     *Id.* ¶ 40.

and Detroit, Michigan respectively.[17] Defendants International Business Machines

Corporation ("IBM") and Fujitsu Ltd. (collectively "the technology defendants")

are multinational computer hardware and software corporations headquartered in

Armonk, New York and Tokyo, Japan respectively. [18] Defendants Barclays Bank

PLC / Barclays National Bank Ltd. ("Barclays") and Union Bank of Switzerland

A.G. ("UBS") (collectively "the banking defendants") are multinational banks

headquartered in London, England and both Zurich and Basel, Switzerland

respectively.[19] Finally, defendant Rheinmetall Group A.G. is a holding company

headquartered in Düsseldorf, Germany and is the parent company of Oerlikon

Contraves A.G., an armaments manufacturer headquartered in Zurich,

Switzerland.[20]

The *Ntsebeza* plaintiffs allege that the automotive defendants – or

their agents or alter egos – committed both direct and secondary violations of the

---

[17]     *See Ntsebeza* Complaint ¶¶ 30-32; *Khulumani* Complaint ¶¶ 33-34,
36.

[18]     *See Ntsebeza* Complaint ¶ 33; *Khulumani* Complaint ¶¶ 35, 37.

[19]     *See Ntsebeza* Complaint ¶ 29; *Khulumani* Complaint ¶¶ 32, 39.

[20]     *See Khulumani* Complaint ¶ 38. Rheinmetall contests personal
jurisdiction and the effectiveness of service under the Hague Convention. *See*
12/4/08 Letter from Jerome S. Hirsch, counsel for Rheinmetall, to the Court.
Those issues have been stayed until after resolution of the instant motion to
dismiss.

6

law of nations by engaging in workplace discrimination that mimicked and enhanced apartheid, suppressing union activities, manufacturing military vehicles for the South African security forces in the face of worker protests, and assisting security forces in identifying and torturing anti-apartheid leaders.[21] The *Ntsebeza* plaintiffs additionally allege that defendant IBM – or its agents or alter egos – committed secondary violations of the law of nations by providing the computer hardware, software, maintenance, and support necessary for the South African Government to carry out geographic segregation and denationalization.[22]   Finally, the *Ntsebeza* plaintiffs allege that defendant Barclays – or its agents or alter egos – directly and indirectly violated the law of nations through its employment practices, which furthered the geographic segregation of the races as well as economic marginalization of black South Africans.[23]

The *Khulumani* plaintiffs allege that the automotive defendants aided and abetted violations of the law of nations by supplying vehicles, parts, and other equipment to the apartheid security forces.[24] The *Khulumani* plaintiffs

---

[21]   *See Ntsebeza* Complaint ¶¶ 54-99, 101-127.

[22]   *See id.* ¶¶ 129-140.

[23]   *See id.* ¶¶ 142-145.

[24]   *See Khulumani* Complaint ¶ 254.

additionally allege that the technology defendants aided and abetted violations of

the law of nations by providing the computer systems necessary to restrict black

South Africans' movements, track dissidents, and target particular individuals for

repressive acts.[25] The *Khulumani* plaintiffs also allege that the banking defendants

aided and abetting violations of the law of nations by providing financial support

to the apartheid regime and the security forces through the purchase of bonds and

the provision of loans, as well as by permitting directors to serve on an advisory

board to the South African Defense Forces.[26] Finally, the *Khulumani* plaintiffs

allege that Rheinmetall aided and abetted violations of the law of nations by

providing armaments and military equipment necessary to suppress dissent,

control the population, and carry out extrajudicial killings.[27]

## B.   Procedural Background

These proceedings began as over a dozen distinct cases; the two that

remain were filed in 2002. A combination of individual claims and putative class

actions, the cases alleged both direct and secondary tort liability for violations of

customary international law perpetrated in apartheid South Africa. On December

---

[25]    *See id.* ¶ 202.

[26]    *See id.* ¶¶ 149, 153, 159.

[27]    *See id.* ¶¶ 178, 198.

8

20, 2002, the United States Judicial Panel on Multidistrict Litigation centralized

pretrial proceedings before Judge John E. Sprizzo of the Southern District of New

York.[28]  On July 14, 2003, defendants who did not contest personal jurisdiction

moved to dismiss the actions.[29]  On November 29, 2004, Judge Sprizzo granted

defendants' motion to dismiss in full on the grounds that aiding and abetting

liability is not available under the ATCA.[30]

      Plaintiffs appealed to the Second Circuit, and on October 12, 2007,

the Circuit affirmed in part and reversed in part.[31]  In a short per curiam opinion,

---

[28]    *See* MDL Transfer Order, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 1 (S.D.N.Y. Dec. 20, 2002).  On December 16, 2008, Judge Sprizzo died.  These cases was reassigned for further pretrial proceedings on December 23, 2008.  *See* Notice of Case Reassignment, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 112 (S.D.N.Y. Dec. 23, 2008).

[29]    *See* Notice of Defendants' Joint Motion, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 41 (S.D.N.Y. July 14, 2003).  On July 31, 2003, Judge Sprizzo stayed motions to dismiss related to service of process and personal jurisdiction.  *See* Transcript, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499 (S.D.N.Y. July 31, 2003).

[30]    *See In re S. Afr. Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *rev'd sub nom.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (per curiam).  Judge Sprizzo additionally dismissed the *Ntsebeza* plaintiffs' non-ATCA claims under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b)-(d).  *See id.* at 555-57.

[31]    *See Khulumani v. Barclays Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (per curiam).

9

the Circuit upheld dismissal of plaintiffs' claims under the TVPA and held that

these cases failed to meet the requirements of diversity jurisdiction.[32] However,

the Circuit reinstated plaintiffs' ATCA claims, expressly holding that "a plaintiff

may plead a theory of aiding and abetting liability under the ATCA."[33] Moreover,

the Circuit vacated the lower court's holding that prudential concerns warranted

dismissal and remanded for further analysis.[34]

Each judge on the panel filed a lengthy concurring opinion. Judge

Robert Katzmann, concurring, wrote that secondary liability standards for torts

recognized under the ATCA should be determined based on customary

international law.[35] Judge Peter Hall, concurring, wrote that such analysis is a

---

[32]     *See id.* at 259-60 (finding that plaintiffs failed to plead allegations
sufficient to meet the "color of law" requirement of the TVPA, 28 U.S.C. § 1350
(note)); *id.* at 260 (finding an absence of diversity jurisdiction).

[33]     *Id.* at 260.

[34]     *See id.* at 261-64. The Circuit expressly noted that if plaintiffs
narrowed their allegations upon remand, the calculus concerning comity and the
political question doctrine would change significantly. *See id.* at 263. Such
changes might even warrant re-solicitation of the views of the Executive Branch
and the Government of South Africa. *See id.* at 263 n.13.

[35]     *See id.* at 264-84 (Katzmann, J., concurring).

matter of federal common law.[36]  Judge Edward Korman, concurring in part and

dissenting in part, wrote that secondary liability standards should be determined

based on customary international law but that aiding and abetting liability is not

sufficiently established under customary international law.[37]  Moreover, Judge

Korman argued at length that these cases should have been dismissed on numerous

other independent grounds, including the political question doctrine, international

comity, and an absence of liability for corporate defendants under customary

international law.[38]

      Defendants next petitioned to the Supreme Court for a writ of

certiorari, but four justices recused themselves.  As the Court was unable to muster

the requisite quorum of six justices, it affirmed the decision of the Second Circuit

in a non-precedential summary order.[39]

      On remand to the district court, plaintiffs filed the two amended,

---

[36]    *See id.* at 284-92 (Hall, J., concurring).

[37]    *See id.* at 319-21 (Korman, J., concurring in part and dissenting in
part).  Judge Edward R. Korman of the Eastern District of New York sat on the
panel by designation.

[38]    *See id.* at 295-311 (Korman, J., concurring in part and dissenting in
part) (political question and comity); *id.* at 321-26 (Korman, J., concurring in part
and dissenting in part) (corporate liability).

[39]    *See American Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008)
(affirming under 28 U.S.C. § 2109).

consolidated Complaints that now constitute the entirety of this litigation:

*Khulumani v. Barclays National Bank Ltd.* and *Ntsebeza v. Daimler A.G.* (which

incorporates the allegations of *Digwamaje v. IBM Corporation*, another major case

within this multi-district litigation).[40]  On December 8, 2008, all defendants but

Rheinmetall filed the instant motion to dismiss.[41]

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, a court must "'accept as true all of the factual

allegations contained in the complaint'"[42] and "draw all reasonable inferences in

---

[40]     *See Ntsebeza* Complaint ¶ 6 n.1.  On September 25, 2008, the Court granted plaintiffs leave to file amended complaints. *See* Order, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 90 (S.D.N.Y. Sept. 25, 2008). Plaintiffs filed their amended complaints on October 24, 2008 and October 27, 2008. *See Khulumani* Complaint , 02 MDL 1499, Docket No. 94 (S.D.N.Y. Oct. 24, 2008); *Ntsebeza* Complaint , 02 MDL 1499, Docket No. 126 (S.D.N.Y. Oct. 27, 2008).

[41]     *See* Notice of Joint Motion to Dismiss, *In re S. Afr. Apartheid Litig.*, 02 MDL 1499, Docket No. 106 (S.D.N.Y. Dec. 8, 2008).

[42]     *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1975 (2007)).

the plaintiff's favor."[43]  A complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'"[44] in order to survive a motion to dismiss. Although the complaint need not provide "detailed factual allegations,"[45] it must nonetheless "amplify a claim with some factual allegations . . . to render the claim *plausible*."[46]  "[B]ald assertions and conclusions of law will not suffice."[47]

**B.    The Alien Tort Claims Act**

Plaintiffs claim jurisdiction in this Court under the ATCA based on torts committed in violation of customary international law.  The statute states in its entirety, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty

---

[43]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[44]    *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965).  *Accord Erickson*, 127 S. Ct. at 2200 (noting that plaintiffs must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Twombly*, 127 S. Ct. at 1955).

[45]    *Twombly*, 127 S. Ct. at 1970.

[46]    *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted*, 128 S. Ct. 2931 (2008).

[47]    *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (citation omitted).

of the United States."[48]  In 1980, the Second Circuit held in *Filártiga v. Peña-Irala*

that the ATCA conveys jurisdiction for civil claims concerning violations of

"universally accepted norms of the international law of human rights, regardless of

the nationality of the parties."[49]  In 2004, the Supreme Court upheld the core of

*Filártiga* in *Sosa v. Alvarez-Machain*.  The Court also provided important

guidance concerning the function of the ATCA.

At its core, the ATCA is a grant of jurisdiction.  However, the ATCA

performs a broader role than authorizing federal courts to hear cases brought under

statutorily defined torts or self-executing treaties.  Rather, pursuant to the ATCA,

federal courts may "hear claims in a very limited category defined by the law of

nations and recognized at common law."[50]  When the First Congress passed the

---

[48]     28 U.S.C. § 1350.  *Accord Kadic v. Karadžić*, 70 F.3d 232, 238 (2d
Cir. 1995) (holding that the ATCA "confers federal subject-matter jurisdiction
when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3)
committed in violation of the law of nations.").  The statute's origins lie in the
Judiciary Act of 1789, which provided that "the new federal district courts 'shall
also have cognizance, concurrent with the courts of the several States, or the
circuit courts, as the case may be, of all causes where an alien sues for a tort only
in violation of the law of nations or a treaty of the United States.'"  *Sosa v.
Alvarez-Machain*, 542 U.S. 692, 712 (2004) (quoting Act of Sept. 24, 1789, ch.
20, § 9, 1 Stat. 77).

[49]     630 F.2d 876, 878 (2d Cir. 1980).

[50]     *Sosa*, 542 U.S. at 712.

ATCA in 1789, three such offenses had been expressly identified in Blackstone's

*Commentaries*: "violation of safe conducts, infringement of the rights of

ambassadors, and piracy."[51]  The Second Circuit has recognized several additional

common law torts defined by customary international law.[52]

## IV.  EXTRATERRITORIALITY

Defendants argue that the ATCA does not provide this Court with

jurisdiction to address torts stemming from extraterritorial events.[53]  The vast

majority of acts described in the Complaints occurred outside of the United

States.[54]  However, that is no bar to this Court's jurisdiction.

"Legislation of Congress, unless a contrary intent appears, is meant to

---

[51]     *Id.* at 716 (citing William Blackstone, 4 *Commentaries* *68).

[52]     *See, e.g.*, *Filártiga*, 630 F.2d at 880 ("[W]e find that an act of torture
committed by a state official against one held in detention violates established
norms of the international law of human rights, and hence the law of nations.").

[53]     *See* Memorandum of Law in Support of Defendants' Joint Motion to
Dismiss ("Def. Mem.") at 38-40.

[54]     *See, e.g.*, *Ntsebeza* Complaint  ¶ 55 (alleging that Daimler
management in Germany managed the provision of military vehicles to the South
African Security Forces); *Khulumani* Complaint  ¶¶ 273-274, 299 (alleging that
GM participated in the production of armor-plated vehicles with military fixtures
in South African facilities).  *But see, e.g.*, *Ntsebeza* Complaint  ¶ 141 (alleging that
IBM worked within the United States to sell technology parts and services to the
South African Government even after it had divested from its South African
subsidiary).

15

apply only within the territorial jurisdiction of the United States."[55]  However, "[i]t

is not extraordinary for a court to adjudicate a tort claim arising outside of its

territorial jurisdiction."[56]  The ATCA is a jurisdictional provision and grants

authority only to "[t]he district courts,"[57] which are uniformly found on U.S. soil.

The ATCA does not by its own terms regulate conduct; rather it applies universal

norms that forbid conduct regardless of territorial demarcations or sovereign

prerogatives.[58]  Therefore, unlike the application of specific rules formulated by

American legislators or jurists, the adjudication of tort claims stemming from acts

---

[55]     *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  *Accord Foley Bros. v. Filardo*, 336 U.S. 281 (1949) (applying this principle as a statutory presumption).  *See generally* William N. Eskridge, Jr. and Philip P. Frickey, *Foreward: Law as Equilibrium*, 108 Harv. L. Rev. 26, 107 (1994) (noting the existence of a common law-based canon of statutory interpretation against extraterritorial application of U.S. law, except for antitrust laws).

[56]     *Filártiga*, 630 F.2d at 885.  *Accord McKenna v. Fisk*, 42 U.S. (1 How.) 241, 248-49 (1843) (noting that English courts were open to foreigners bringing civil torts, even against other foreigners found in England, for torts committed outside of England or its empire).

[57]     28 U.S.C. § 1350.

[58]     *Cf. Convention on Torture: Hearing before the S. Comm. on Foreign Relations*, 100th Cong. 8 (1990) (statement of Abraham Sofaer, Legal Advisor, United States Department of State) ("[A]s a member of the international community, we must stand with other nations in pledging to bring to justice those who engaged in torture whether in U.S. territory or in the territory of other countries.").

committed abroad will not generate conflicting legal obligations,[59] and there is a

substantially reduced likelihood that adjudication will legitimately offend the

sovereignty of foreign nations.[60]

In *Wiwa v. Royal Dutch Petroleum Co.*, the Second Circuit stated that

"the text of the [ATCA] seems to reach claims for international human rights

abuses occurring abroad."[61] While this pronouncement may not be a definitive

statutory analysis, the Circuit's statement – read in concert with its rejection of

*forum non conveniens* as a bar to adjudication of torts in violation of the law of

nations based on extraterritorial acts[62] – permits this Court to entertain ATCA

claims based on extraterritorial conduct. Moreover, the Ninth Circuit has squarely

held that a court's jurisdiction to hear claims under the ATCA is not limited by

---

[59]     *Cf. Arabian Am. Oil Co.*, 499 U.S. at 248, 256 (noting the need to avoid conflict with foreign laws).

[60]     *Cf. The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824) (expressing limitations on the legal authority of one nation to extend its law beyond its borders). *See also* Part VIII, *infra* (discussing the application of prudential concerns to the cases at bar).

[61]     226 F.3d 88, 105 n.10 (2d Cir. 2000).

[62]     *See id.* at 100 (noting that *forum non conveniens* analysis is necessary only if the court is "'a permissible venue with proper jurisdiction over the claim'" (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998)).

17

"the locus of the injury."[63]  Numerous other district courts have adjudicated ATCA

claims arising from extraterritorial events.[64]  Given the universal agreement of

federal courts, as well as the inapplicability of the presumption against

extraterritorial application of statutes, defendants' extraterritoriality defense is

rejected.  The ATCA provides this Court with the authority to hear claims for torts

committed abroad, including the allegations at issue in this case.

## V.    RECOGNIZED TORTS

The Complaints allege that defendants have committed a panoply of

torts, under both direct and secondary liability theories.  Specifically, the *Ntsebeza*

plaintiffs allege apartheid, under direct, aiding and abetting, and conspiracy

theories; denial of the right to a nationality, under aiding and abetting and

conspiracy theories; extrajudicial killing, under aiding and abetting and conspiracy

theories; torture, under aiding and abetting and conspiracy theories; and cruel,

inhuman, or degrading treatment ("CIDT"), under direct, aiding and abetting, and

conspiracy theories.[65]  The *Khulumani* plaintiffs allege apartheid, extrajudicial

---

[63]     *Trajano v. Marcos*, 978 F.2d 493, 500 (9th Cir. 1992).

[64]     *See, e.g.*, *Bowoto v. Chevron*, No. 99 Civ. 2506, 2009 WL 593872
(N.D. Cal. Mar. 4, 2009) (noting completion of a jury trial in an ATCA case
addressing extrajudicial killing in Nigeria).

[65]     *See Ntsebeza* Complaint ¶¶ 159-185.

18

killing, torture, prolonged unlawful detention, and CIDT, all under aiding and abetting and conspiracy theories.[66]

Defendants do not contest that many of these torts are cognizable under international law. However, they dispute the existence of causes of action for apartheid by a non-state actor[67] and for denial of the right to a nationality by a state actor.[68] Moreover, although defendants do not contest the existence of customary international law forbidding CIDT, this Court must outline the scope of that prohibition in order to assess the sufficiency of plaintiffs' allegations. Finally, defendants assert that the law of nations does not recognize corporate liability for any of these torts.[69]

### A.    Applicable Law

#### 1.    Recognition of Torts Under the Law of Nations

As noted earlier, at the time Congress enacted the ATCA, three torts were recognized at common law as violations of the law of nations: "violation of

---

[66]    *See Khulumani* Complaint ¶¶ 303-441.

[67]    *See* Def. Mem. at 14-15.

[68]    *See id.* at 20.

[69]    *See id.* at 40-42.

19

safe conducts, infringement of the rights of ambassadors, and piracy."[70]

Customary international law has evolved significantly in the more than two

hundred years since passage of the First Judiciary Act.  As a result, the number of

torts that violate the law of nations has increased, and Congress has erected no

barrier to their recognition under the ATCA.[71]  A tort that violates customary

international law will be recognized if

> the norm alleged (1) is defined with a specificity
> comparable to the 18th-century paradigms discussed in
> *Sosa*, (2) is based upon a norm of international character
> accepted by the civilized world, and (3) is one that States
> universally abide by, or accede to, out of a sense of legal
> obligation and mutual concern.[72]

"[T]he door is still ajar subject to vigilant doorkeeping."[73]  Both private

individuals and those acting under the color of law may be liable for violations of

---

[70]     *Sosa*, 542 U.S. at 716 (citing William Blackstone, 4 *Commentaries* *68).

[71]     *See id.* at 725.

[72]     *Abdullahi v. Pfizer, Inc.*, ___ F.3d ___, Nos. 05 Civ. 4863, 05 Civ. 6768, 2009 WL 214649, at *6 (2d Cir. Jan. 30, 2009). *Accord Filártiga*, 630 F.2d at 878 (finding that the ATCA confers jurisdiction concerning "universally accepted norms of the international law of human rights, regardless of the nationality of the parties").

[73]     *Sosa*, 542 U.S. at 729. *Accord Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir. 2003) ("[I]n determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint.").

customary international law,[74] but the question of whether tort liability exists is distinct for each category of defendant.[75] Moreover, a defendant is liable solely with regard to international norms in effect at the time of the allegedly tortious act.[76]

Under this rubric, the Second Circuit has recognized tort liability for torture, genocide, and war crimes committed by both state and non-state actors.[77] Moreover, a state actor may be held liable for the tort of "large-scale, nonconsensual drug testing on humans."[78] The Ninth Circuit has recognized additional causes of action against state actors for summary execution and prolonged and arbitrary detention[79] and against non-state actors for forced labor.[80]

---

[74]    *See Kadic*, 70 F.3d at 239.

[75]    *See Sosa*, 542 U.S. at 732 n.20.

[76]    *See Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 120 (2d Cir. 2008) (noting plaintiffs' concession that it was not clearly established that defendants' conduct during the Vietnam War violated norms of customary international law established prior to 1975).

[77]    *See Kadic*, 70 F.3d at 239 (quoting Restatement (Third) of the Foreign Relations Law of the United States §§ 404, 702).

[78]    *Abdullahi*, 2009 WL 214649, at *16.

[79]    *See In re Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994).

[80]    *Doe v. Unocal Corp.*, 395 F.3d 932, 946-47 (9th Cir. 2002), *dismissed by stipulation pending rehearing en banc*, 403 F.3d 708 (9th Cir. 2005).

21

However, not every claim asserted to be a tort in violation of customary international law has been recognized as actionable under the federal courts' ATCA jurisdiction.  In *Sosa*, the Supreme Court held that short-term arbitrary detention does not trigger tort liability.[81]  The Second Circuit has declined to recognize torts in violation of international law for private racial or religious discrimination,[82] violation of a "right to life or right to health,"[83] failure to provide consular notification and access after arrest,[84] and regulatory takings,[85] and the Ninth Circuit has declined to recognize a tort in violation of the law of nations for simple fraud.[86]  The Eleventh Circuit has also declined to recognize a cause of action for CIDT.[87]

"[T]he usage and practice of States – as opposed to judicial decisions

---

[81]     *See Sosa*, 542 U.S. at 736 (noting that Alvarez-Machain was detained unlawfully for no more than a day).

[82]     *See Bigio v. Coca-Cola*, 239 F.3d 440 (2d Cir. 2001).

[83]     *Flores*, 414 F.3d 254.

[84]     *See Mora v. New York*, 524 F.3d 183 (2d Cir. 2008).

[85]     *See Zapata v. Quinn*, 707 F.2d 691 (2d Cir. 1983).

[86]     *See Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995).

[87]     *See Aldana v. Del Monte Fresh Produce, N.A.* ("*Aldana I*"), 416 F.3d 1242, 1247 (11th Cir. 2005) (per curiam).

or the works of scholars – constitute the primary sources of customary

international law."[88]  When determining whether to recognize a tort in violation of

customary international law, however, a court makes a holistic assessment of state

practice along with international legal materials, treaties, and proclamations.[89]

Although adherence to rules articulated in a particular source of law need not be

absolute,[90] some international legal instruments will have little to no evidentiary

weight when determining the universal law of nations.[91]

---

[88]     *Flores*, 414 F.3d at 250 (citing *United States v. Yousef*, 327 F.3d 56,
99-103 (2d Cir. 2003)).

[89]     *See Abdullahi*, 2009 WL 214649, at *11 (holding that sources of
international law that cannot alone establish torts are still "potent authority for
universal acceptance of" a norm). *See also Flores*, 414 F.3d at 252 (noting "that
recourse may be had to secondary sources such as 'unilateral declarations,
instructions to diplomatic agents, laws and ordinances, and *in a lesser degree*, to
the writings of authoritative jurists,' as evidence of the 'acts' and 'practice[s]' of
States.'" (quoting Clive Parry, *The Sources and Evidences of International Law* 2
(1965)); *Kadic*, 70 F.3d at 239 (relying almost entirely on the Restatement (Third)
of the Foreign Relations Law of the United States).

[90]     *See Flores*, 414 F.3d at 248 ("Of course, States need not be
universally successful in implementing the principle in order for a rule of
customary international law to arise.").

[91]     *See id.* at 257 (noting that the evidentiary weight of a treaty increases
as more countries ratify it and those countries implement and abide by its
principles). *See also* Restatement (Third) of the Foreign Relations Law of the
United States § 102(3) (noting that international agreements create customary
international law only when "such agreements are intended for adherence by states
generally and are in fact widely accepted").

## 2.    Corporate Liability

Footnote twenty of *Sosa v. Alvarez-Machain* anticipated that suits

under the ATCA might be brought against "an individual actor such as a

corporation or individual" and noted the need for separate analysis of the

applicability of particular norms of customary international law to state and non-

state actors.[92]   Although relying on pre-*Sosa* cases, Judge Katzmann wrote in his

*Khulumani* concurrence that decisions of the Second Circuit "have repeatedly

treated the issue of whether corporations may be held liable under the ATCA as

indistinguishable from the question of whether private individuals may be."[93]

Other circuits have also implicitly extended ATCA liability to corporations.[94]

### B.    Discussion

#### 1.    Apartheid by a Non-State Actor

"Racial discrimination is a violation of customary law when it is

practiced systematically as a matter of state policy."[95]   However, private racial

---

[92]    542 U.S. at 732 n.20.

[93]    *Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring) (citing *Bigio*, 239 F.3d at 447; *Flores*, 414 F.3d at 244).

[94]    *See Aldana I*, 416 F.3d at 1247-48; *Doe v. Unocal Corp.*, 395 F.3d at 945-46; *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 163 (5th Cir. 1999).

[95]    Restatement (Third) of the Foreign Relations Law of the United States § 702, cmt. i. *Accord Presbyterian Church of Sudan v. Talisman Energy,*

discrimination alone, "[h]owever reprehensible," does not violate customary international law.[96] Plaintiffs contend that context matters; in the context of apartheid, private racial discrimination, denial of the right to work, freedom of expression, and freedom of association constitute acts of apartheid by a non-state actor. Nonetheless, this claim does not meet the requisite standard of specificity, international character, and universal acceptance based on "legal obligation and mutual concern."[97]

Plaintiffs advance two international legal instruments as the source of their claim: the International Convention on the Suppression and Punishment of the Crime of Apartheid ("the Apartheid Convention") and the Rome Statute of the International Criminal Court ("ICC").[98] However, the Apartheid Convention is not a persuasive source for the determination of a norm of international character

---

*Inc.* ("*Talisman I*"), 244 F. Supp. 2d 289, 305 (S.D.N.Y. 2003), *appeal pending* No. 07-0016 (2d Cir. argued Jan. 12, 2009).

[96]     *Bigio*, 239 F.3d at 448.

[97]     *Abdullahi*, 2009 WL 214649, at *6.

[98]     *See* International Convention on the Suppression and Punishment of the Crime of Apartheid, 13 I.L.M. 50, 1015 U.N.T.S. 243 (1976); Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90.

accepted by the civilized world.[99] Despite near-universal condemnation of

apartheid, Western European and North American countries have neither signed

nor ratified the treaty.[100] This illustrates substantial international conflict

concerning acceptance of the precise norms articulated in the text of the Apartheid

Convention.[101] Moreover – according to State Department reports – a substantial

proportion of the nations that have ratified the Apartheid Convention have poor

human rights records.[102] A treaty signed by countries that routinely violate human

---

[99]     *See generally Khulumani*, 504 F.3d at 319-20 (Korman, J., concurring
in part and dissenting in part) (describing the weakness of the Apartheid
Convention as a source of customary international law).

[100]     *See* United Nations, Office of the High Commissioner for Human
Rights, *Status of Ratification, ICSPCA*,
http://www.unhchr.ch/html/menu3/b/treaty8_asp.htm.

[101]     *See* Restatement (Third) of the Foreign Relations Law of the United
States § 102(2) (noting that customary international law is only the firm consensus
of the community of developed nations).

[102]     *Compare Status of Ratification, ICSPCA*, *with* United States
Department of State, *2008 Country Reports on Human Rights Practices*, *available
at* http://www.state.gov/g/drl/rls/hrrpt/2008/index.htm, *and* Office of the High
Commissioner for Human Rights, United Nations, *Human Rights in the World*,
*available at* http://www.ohchr.org/EN/Countries/Pages/
HumanRightsintheWorld.aspx. The State Department's 2008 Country Reports on
Human Rights Practices for signatories contain statements such as "The
government's human rights record remained poor," "The government[] . . .
continued to commit numerous serious abuses," and "The government continued
to engage in the pervasive and systematic abuse of human rights." Of course not
every ratifier of the Apartheid Convention routinely violates human rights.

26

rights obligations is less likely to articulate norms that those countries "abide by, or accede to, out of a sense of legal obligation."[103]

Therefore the sole remaining potential source for a tort of apartheid by a non-state actor is the Rome Statute, which defines the crime of apartheid as

> inhumane acts . . . committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime.[104]

Inhumane acts are further defined as actions of a character similar to murder, extermination, enslavement, deportation, imprisonment, torture, sexual violence, persecution against any identifiable group, or enforced disappearance.[105] Theoretically, a private act of apartheid may be described with the requisite degree of specificity. The elements of private apartheid would be (1) persecution against any identifiable group (2) committed in the context of an institutionalized regime of systemic racial discrimination (3) with the intention of maintaining that regime.

This reading of the Rome Statute is strained to say the least; a more reasonable interpretation of that statute would require a combination of acts

---

[103]   *Abdullahi*, 2009 WL 214649, at *6.

[104]   Rome Statute art. 7(2)(h).

[105]   *See id.* art. 7(1).

similar to those defined by statute as inhumane. Moreover, the need for such particularized analysis of a single international legal instrument demonstrates that private apartheid is not a uniformly-accepted prohibition of international character. Although the establishment of state-sponsored apartheid and the commission of inhumane acts needed to sustain such a system is indisputably a tort under customary international law,[106] the international legal system has not thus far definitively established liability for non-state actors who follow or even further state-sponsored racial oppression. Therefore, this Court declines to recognize a tort of apartheid by a non-state actor. The *Ntsebeza* plaintiffs' direct liability claims must be dismissed.

### 2.    Arbitrary Denationalization by a State Actor

No federal case has addressed whether arbitrary denationalization by a state actor is a tort in violation of customary international law. However, this prohibition is defined with specificity, is based upon an accepted international norm, and is nearly universally accepted out of both "legal obligation and mutual concern." The Restatement (Third) of the Foreign Relations Law of the United States notes,

---

[106]    *See Khulumani*, 504 F.3d at 273 (Katzmann, J., concurring) (describing apartheid as a "fundamental human rights concern," alongside torture, slavery, and genocide, all recognized torts when committed by a state actor).

28

> Traditional international law did not question the authority
> of a state to terminate the nationality of any of its nationals.
> Increasingly, the law has accepted some limitations on
> involuntary termination of nationality, both to prevent
> statelessness and in recognition that denationalization can
> be an instrument of racial, religious, ethnic, or gender
> discrimination, or of political repression.[107]

From this statement, definite elements of a tort may be recognized.  A state actor

commits arbitrary denationalization if it terminates the nationality of a citizen

either arbitrarily or on the basis of race, religion, ethnicity, gender, or political

beliefs.

The wealth of international legal instruments articulating a

prohibition against arbitrary denationalization indicates both the international

nature of the norm and the breadth of its acceptance.  In 1907, the Hague

Convention Respecting the Laws and Customs of War on Land first articulated

that individuals have a right to retain their citizenship, even in the face of a hostile

invasion.[108]  Soon thereafter, the United States representative to a 1916 conference

concerning the codification of international law stated, "The scope of municipal

law governing nationality must be regarded as limited by consideration of the

---

[107]     Restatement (Third) of Foreign Relation Law § 211 cmt. e (1987).

[108]     *See* Fourth Hague Convention Respecting the Laws and Customs of
War on Land art. 45, Oct. 18, 1907, 36 Stat. 2277, 2306.

rights and obligations of individuals and other states."[109] Since then the United

States has joined over a hundred other nations in signing and ratifying the

International Convention on the Elimination of All Forms of Racial

Discrimination, which recognizes that a country may not deprive citizens of their

nationality on the basis of race.[110] Finally, broadly accepted regional international

legal materials repeat this prohibition.[111]

---

[109]   1 Conference for the Codification of International Law, *Bases of Discussion* 16 (1916), *quoted in* Hersch Lauterpacht, *International Law: Collected Papers of Hersch Lauterpacht* 392 (Elihu Lauterpacht ed., 1970).

[110]   International Convention on the Elimination of All Forms of Racial Discrimination art. 5, § d(iii), opened for signature Mar. 7, 1966, S. Exec. Doc. C, 95-2 (1978), 5 I.L.M. 350, 356 (entered into force Jan. 4, 1969). Every member-state of the United Nations with the exception of the United States and Somalia has also ratified the Convention on Rights of the Child, which also recognizes this norm. *See* United Nations Convention on the Rights of the Child art. 8, § a, Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448, 1460 (entered into force Sept. 2, 1990).

[111]   *See* European Convention on Nationality art. 4(a), Nov. 6, 1997, 37 I.L.M. 44, 48 ("[N]o one shall be arbitrarily deprived of his or her nationality"); American Convention on Human Rights art. 20, opened for signature Nov. 22, 1969, 9 I.L.M. 99, 107 ("No one shall be arbitrarily deprived of his nationality or of the right to change it."). The United States has signed the American Convention on Human Rights but has not yet ratified it. *See* Diane Marie Amann, *International Law and Rehnquist-Era Reversals*, 94 Geo. L.J. 1319, 1322 n.23 (2006). *See also* Nadia Ezzelarab & Brian Tittemore, *Round Table Discusses U.S. Ratification of Inter-American Convention on Human Rights*, Human Rights Brief (1994) (noting that the United States' failure to ratify the treaty stemmed from objections concerning the death penalty and abortion).

30

The bar on arbitrary denationalization reflects both "legal obligation and mutual concern." States face condemnation for violating this norm, including suit in the International Court of Justice.[112] Moreover, as the Restatement notes, the prohibition on arbitrary denationalization reflects international concern regarding the existence of stateless persons.[113] In short, I conclude that the tort of arbitrary denationalization satisfies the Second Circuit's test for recognition of a tort in violation of the law of nations.

### 3.    Cruel, Inhuman, or Degrading Treatment[114]

The international norm forbidding CIDT is enshrined in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), a nearly-universally accepted multilateral

---

[112]    *See, e.g.*, *Application of the International Convention on the Elimination of All Forms of Racial Discrimination* (*Georgia v. Russ.*), Transcript, CR 2008/22, at 24 (I.C.J. Sept. 8, 2008) (outlining allegations concerning denationalization).

[113]    *See* Restatement (Third) of Foreign Relation Law § 211 cmt. e (1987). *See also* Convention Relating to the Status of Stateless Persons, Sept. 28, 1954, 189 U.N.T.S. 150.

[114]    As noted above, defendants do not contest the existence of a tort under the law of nations for CIDT. Moreover, although the Eleventh Circuit has declined to exercise ATCA jurisdiction over such a claim, *see Aldana I*, 416 F.3d at 1247, I find Judge Rosemary Barkett's dissent to the denial of *en banc* review of that decision quite persuasive. *See Aldana v. Del Monte Fresh Produce, N.A.* ("*Aldana II*"), 452 F.3d 1284, 1284-89 (11th Cir. 2006) (Barkett, J., dissenting).

treaty.[115]  CAT states,

> Each State Party shall undertake to prevent in any territory
> under its jurisdiction other acts of cruel, inhuman or
> degrading treatment or punishment which do not amount to
> torture . . . , when such acts are committed by or at the
> instigation of or with the consent or acquiescence of a
> public official or other person acting in an official
> capacity.[116]

However, the widespread acceptance of the CAT does not render all cruel,

degrading, or even inhuman state conduct a violation of the law of nations.  CIDT

is the intentional infliction of mental or physical suffering, anguish, humiliation,

fear, or debasement against a person in the offender's custody or control that

nevertheless falls short of torture.  This definition rests on the use of the term in

both international and American law, as explained below.

The custody or control requirement, as well as the relationship

between CIDT and torture, are evident throughout international law.  The Rome

Statute's sole reference to CIDT is found in article 55, which addresses the

---

[115]      *See* CAT, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85.  *See also*
United Nations Treaty Collection, *Convention Against Torture and Other Cruel,
Inhuman or Degrading Treatment or Punishment*,
http://treaties.un.org/Pages/ViewDetails.aspx?src=UNTSONLINE&tabid=2&id=1
29&chapter=4&lang=en (noting the ratification history of the treaty).

[116]      CAT art. 16, § 1.

"Rights of persons during an investigation."[117]  Specifically, the Rome Statute

describes CIDT as an omnibus category covering abuses such as "coercion, duress

or threat to torture."[118]  The  Restatement (Third) of the Foreign Relations Law of

the United States clarifies the concept of CIDT by noting, "The difference between

torture and cruel, inhuman, or degrading treatment or punishment 'derives

principally from a difference in the intensity of the suffering inflicted.'"[119]

This definition is further buttressed by uses of the term CIDT in

domestic law.  The Detainee Treatment Act of 2005 states, "No individual in the

---

[117]    Rome Statute art. 55.

[118]    *Id.* art. 55(b).  *Accord* Restatement (Third) of the Foreign Relations
Law of the United States § 702(d) (noting that a state violates customary
international law if it practices "torture or other cruel, inhuman, or degrading
treatment or punishment").  *Cf.* International Covenant on Civil and Political
Rights art. 7, Dec. 19, 1966, 999 U.N.T.S. 171 ("No one shall be subjected to
torture or to cruel, inhuman or degrading treatment or punishment. In particular,
no one shall be subjected without his free consent to medical or scientific
experimentation.").  Although it is possible for non-consensual medical
experimentation to occur outside the context of captivity, *see Abdullahi*, 2009 WL
214649, at *16, this injunction is generally considered a prohibition against torture
and the mistreatment of detainees.  *See, e.g.*, Eric Posner, *Human Welfare, Not
Human Rights*, 108 Colum. L. Rev. 1758, 1773 n.66 (2008) (describing this
provision as a "ban on torture"); Roberto Andorno, *Global Bioethics and Human
Rights*, 27 Med. & L. 1, 2-3 (2008) (noting the origins of this provision in "the
abusive treatment of concentration camp prisoners by Nazi medical doctors").

[119]    Restatement (Third) of the Foreign Relations Law of the United
States § 702 Reporter's Note 5 (quoting *Ireland v. United Kingdom*, 25 Eur. Ct.
Hum. Rts. (ser. A) ¶ 167 (1978)).

33

custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment."[120]  Similarly, Executive Order 13,440 addresses the meaning of CIDT in relation to CIA interrogation procedures.[121]  Other domestic references to CIDT repeatedly address CIDT alongside torture,[122] which by definition must be carried out "upon another person within [the offender's] custody or physical control."[123]

### 4.    Corporate Liability

Defendants allege that apart from the inquiry into whether customary international law creates liability for state and non-state actors, this Court must

---

[120]    42 U.S.C. § 2000dd(a).

[121]    *See* Executive Order No. 13,440, § 2(c), 72 F.R. 40707 (July 20, 2007) (defining CIDT as "the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States").

[122]    *See, e.g.*, 22 U.S.C. § 262d(a)(1) (directing that development aid be channeled to countries that do not engage in "torture or cruel, inhumane, or degrading treatment or punishment, prolonged detention without charges, or other flagrant denial to life, liberty, and the security of person"); *id.* § 6402 (defining "particularly severe violations of religious freedom" to include "torture or cruel, inhuman, or degrading treatment or punishment").

[123]    War Crimes Act, 18 U.S.C. § 2441(d)(1)(A).  *Accord* TVPA, 28 U.S.C. § 1350 note, § 3(b)(1).

determine whether torts in violation of the law of nations apply to corporations.[124] However, defendants aim to reopen a long-settled question in this Circuit. On at least nine separate occasions, the Second Circuit has addressed ATCA cases against corporations without ever hinting – much less holding – that such cases are barred.[125] Regardless of the position that this Court might take if the issue of corporate liability were unresolved, this Court is bound by the decisions of the Second Circuit.

Moreover, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, Judge Denise Cote of the Southern District of New York wrote two lengthy and persuasive explanations of the basis for corporate liability in ATCA cases.[126] This Court need not repeat her analysis. Under the jurisprudence of this Circuit, corporations are liable in the same manner as natural persons for torts in violation

---

[124]    *See* Def. Mem. at 40-42.

[125]    *See Abdullahi*, 2009 WL 214649, at *6; *Vietnam Ass'n for Victims of Agent Orange*, 517 F.3d at 108; *Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring); *Flores*, 414 F.3d at 244; *Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004); *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002); *Bigio*, 239 F.3d at 447; *Wiwa*, 226 F.3d at 104; *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998).

[126]    *See Talisman I*, 244 F. Supp. 2d at 308-19; *Presbyterian Church of Sudan v. Talisman Energy, Inc.* ("*Talisman II*"), 374 F. Supp. 2d 331, 335-37 (S.D.N.Y. 2005), *appeal pending* No. 07-0016 (2d Cir. argued Jan. 12, 2009).

of the law of nations.[127]

## VI.   SECONDARY LIABILITY STANDARDS

Plaintiffs' remaining claims do not allege direct violations of the law

of nations. Rather, they assert that defendants aided and abetted violations of the

law of nations committed by the apartheid government that ruled South Africa

from 1948 to 1994. Although the Second Circuit held in this case that "a plaintiff

may plead a theory of aiding and abetting liability under the ATCA,"[128] the

division of opinion between the two authors of the per curiam opinion left this

Court without a standard to apply or even a decision concerning the source of law

from which this Court should derive a standard.[129]  In addition, the Second Circuit

---

[127]     Notably, the Second Circuit requested additional briefing on this
precise question during oral argument in *Talisman*. *See* 1/22/09 Letter from Carey
R. D'Avino, appellants' attorney, to the Court, *Presbyterian Church of Sudan v.
Talisman Energy, Inc.*, No. 07-0017 (2d Cir. argued Jan. 12, 2009); 1/22/09 Letter
from Marc Gottridge, appellees' attorney, to the Court, *Presbyterian Church of
Sudan v. Talisman Energy, Inc.*, No. 07-0017 (2d Cir. argued Jan. 12, 2009).
Should the Circuit determine that corporations are immune from liability under
customary international law, it is likely that this case will be dismissed.

[128]     *Khulumani*, 504 F.3d at 260.

[129]     Although Judge Korman asserted that purported overlap between his
dissent in *Khulumani* and Judge Katzmann's concurrence provide "a clear
standard, adopted by a majority of the panel, for [the lower court] to apply," *id.* at
333 (Korman, J., concurring in part and dissenting in part), the convergence of
dicta does not create a holding. No statement other than the per curiam opinion is
binding on this Court. *See id.* at 286 n.4 (Hall, J., concurring) ("It is thus left to a

36

did not address the existence of conspiratorial liability under the ATCA, let alone

the elements of such a claim.

## A.    Source of Law

Defendants contend that standards concerning secondary liability

must be determined based on customary international law.[130]   Plaintiffs assert that

secondary liability standards are properly derived from federal common law and –

more importantly – that this initial inquiry is irrelevant because the results of the

inquiries are the same.[131]   Although cases in this Circuit have only required

consultation of the law of nations concerning the *existence of substantive offenses*,

the language and logic of *Sosa* require that this Court turn to customary

international law to ascertain the *contours of secondary liability* as well.

---

future panel of this Court to determine whether international or domestic federal
common law is the exclusive source from which to derive the applicable law.");
*Mastafa v. Australian Wheat Bd.*, No. 07 Civ. 7955, 2008 WL 4378443, at *4 n.4
(S.D.N.Y. Sept. 24, 2008) (noting that *Khulumani* left the standard unresolved and
declining to adopt a standard due to plaintiffs' failure to make adequate mens rea
allegations under either standard to even satisfy the knowledge requirement).
Defendants conceded at oral argument that the Circuit has not yet resolved issue.
*See* 2/26/09 Hearing Transcript, at 6:19.

[130]    *See* Def. Mem. at 17.

[131]    *See* Plaintiffs' Joint Memorandum of Law in Opposition to
Defendants' Joint Motion to Dismiss Plaintiffs' Amended Complaints ("Pl.
Mem.") at 22-23.

The ATCA "enable[s] federal courts to hear claims in a very limited category defined by the law of nations."[132]  As Judge Katzmann recognized in his concurrence, an allegation of aiding and abetting a violation of international law or conspiring to violate international law asserts a distinct claim.[133]  Thus the judicial act remains one of "recognition," not common law rule-making.[134]  There can be no doubt that aiding and abetting claims create liability for a distinct form of conduct.  This Court's jurisdiction under the ATCA allows only for the regulation of conduct that is universally forbidden.

Moreover, *Sosa*'s admonition that courts must exercise "an element of judgment about the practical consequences" before recognizing liability under the ATCA necessitates the use of customary international law as the source of law concerning secondary liability.[135]  The practical consequences of regulating secondary liability under the ATCA affect conduct around the globe.[136]  The United

---

[132]    *Sosa*, 542 U.S. at 712.

[133]    *See Khulumani*, 504 F.3d at 268 (Katzmann, J., concurring).

[134]    *Sosa*, 542 U.S. at 729.

[135]    *Id.* at 732-33.

[136]    Given the United States' role as a central hub of commerce and international diplomacy, the effective jurisdiction of United States federal courts far exceeds this nation's citizens and residents. *See, e.g.*, *Kadic*, 70 F.3d at 246-47 (describing personal service on an ATCA defendant in the lobby of a Manhattan

States does not establish such rules alone.  As the ATCA is merely a jurisdictional

vehicle for the enforcement of universal norms, the contours of secondary liability

must stem from international sources.  Ideally, the outcome of an ATCA case

should not differ from the result that would  be reached under analogous

jurisdictional provisions in foreign nations such as Belgium, Canada, or Spain.[137]

The task of a domestic court is to provide a forum, procedures, and a remedy.[138]

Anything more constitutes impermissible judicial policing.[139]

---

hotel and again outside a foreign embassy).

[137]   *See* Ley Organica del Poder Judicial art. 23(4) (Spain) (providing
universal jurisdiction for criminal prosecutions for violations of the law of
nations); Debbie Johnston, *Lifting the Veil on Corporate Terrorism: The Use of
the Criminal Code Terrorism Framework to Hold Multinational Corporations
Accountable for Complicity in Human Rights Violations Abroad*, 66 U. Toronto
Fac. L. Rev. 137, 142-43 (2008) (comparing several Canadian laws to the ATCA);
Damien Vandermeersch, *Prosecuting International Crimes in Belgium*, 3 J. Int'l
Crim. Just. 400 (2005) (describing extraterritorial jurisdiction in Belgium for
violations of *jus cogens* norms of international law).  *Cf. Guaranty Trust Co. v.
York*, 326 U.S. 99, 109 (1945) ("[I]n all cases where a federal court is exercising
jurisdiction solely because of the diversity of citizenship of the parties, the
outcome of the litigation in the federal court should be substantially the same.").

[138]   *See Kadic*, 70 F.3d at 246 ( "The law of nations generally does not
create private causes of action to remedy its violations, but leaves to each nation
the task of defining the remedies that are available for international law
violations.").

[139]   *Cf.* Anthony J. Colangelo, *The Legal Limits of Universal Jurisdiction*,
47 Va. J. Int'l L. 149, 150 (2006) ("If national courts prosecute on grounds of
universal jurisdiction, they must use the international legal definitions – contained
in customary international law – of the universal crimes they adjudicate;

A secondary concern relates to *Sosa*'s requirement that any tort alleged pursuant to the ATCA must be defined with specificity by the law of nations.[140]   This rule stems from the Supreme Court's nearly two-centuries old decision in *United States v. Smith*, which noted that if a violation of the law of nations were not defined with "reasonable certainty," it would raise constitutional concerns.[141]   The imposition of liability based on a cause of action derived after the conduct in question from an amalgamation of the law of nations and federal common law would raise fundamental fairness concerns.[142]

## B.    Aiding and Abetting

There are a multitude of international legal materials from which this Court may draw a standard concerning aiding and abetting liability under the ATCA.  I will focus on three sets of sources that the Second Circuit has deemed particularly authoritative: the judgments of the International Military Tribunal at

---

otherwise, their exercise of universal jurisdiction contradicts the very international law upon which it purports to rely.").

[140]    *See Sosa*, 542 U.S. at 732 (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 163-80 (1820)).

[141]    *Smith*, 18 U.S. at 161-63.

[142]    *Cf. Vietnam Veterans Ass'n for Victims of Agent Orange*, 517 F.3d at 123 (requiring application of "a norm [of customary international law] that was universally accepted at the time of the events giving rise to the injuries alleged").

Nuremberg, the decisions of the International Criminal Tribunal for the Former
Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda
("ICTR"), and the Rome Statute of the International Criminal Court.[143]

### 1.   *Actus Reus*[144]

"'[T]he *actus reus* of aiding and abetting in international criminal law
requires practical assistance, encouragement, or moral support which has a
*substantial effect* on the perpetration of the crime.'"[145] The parties do not dispute
this.[146] However, the parties have significantly different views as to the meaning
of this language.  Therefore, it is necessary to establish precisely what is meant by
"a substantial effect on the perpetration of the crime."

---

[143]   *See Khulumani*, 504 F.3d at 270-76 (Katzmann, J., concurring)
(establishing the importance of these sources).

[144]   Although the terms *actus reus* and *mens rea* are ordinarily applied to
criminal law, the ATCA provides an alternative civil remedy for violations of
customary international law that are traditionally addressed as crimes.  Thus *actus
reus* and *mens rea* provide a useful framework for analysis of the elements of
aiding and abetting under the law of nations.

[145]   *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (quoting
*Prosecutor v. Furundzija*, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 235
(Dec. 10, 1998).  *Accord United States v. Von Weizsacker* ("*The Ministries Case*"),
*in* 14 *Trials of War Criminals Before the Nuernberg Military Tribunals*, at 478
(1950) ("The question is whether . . . in any substantial manner they aided,
abetted, or implemented it.").

[146]   *See* Def. Mem. at 17; Pl. Mem. at 28.

It is (or should be) undisputed that simply doing business with a state or individual who violates the law of nations is insufficient to create liability under customary international law. International law does not impose liability for declining to boycott a pariah state or to shun a war criminal. Aiding a criminal "is not the same thing as aiding and abetting [his or her] alleged human rights abuses."[147] On the other hand, assistance having a substantial effect "need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal."[148] An accessory may be found liable even if the crimes could have been carried out through different means or with the assistance of another.[149]

Substantial effect is best defined by analyzing the difference between two canonical decisions of the International Military Tribunal at Nuremberg. In *The Ministries Case*, the Nuremberg Tribunal found Karl Rasche, a banker who had facilitated large loans to a fund at the personal disposal of Heinrich Himmler –

---

[147]   *Mastafa*, 2008 WL 4378443, at *4.

[148]   *Furundzija* ¶ 209. *Accord Mastafa*, 2008 WL 4378443, at *3 (noting that a requirement of but-for causality "would significantly undermine aiding and abetting liability in the federal courts").

[149]   *See Prosecutor v. Tadic*, Case No. IT-94-1-T, Trial Chamber Judgment ("*Tadic I*") ¶ 688 (May 7, 1997); *Blagovjevic v. Jokic*, Case No. IT-02-60-A, Appeal Judgement ¶¶ 127, 134 (May 9, 2007).

head of the S.S. – not guilty of aiding and abetting crimes against humanity.[150]

The Tribunal held that "[l]oans or sale of commodities to be used in an unlawful

enterprise may well be condemned from a moral standpoint and reflect no credit

on the part of the lender or seller in either case, but the transaction can hardly be

said to be a crime."[151]   The Tribunal further explained its analogy by describing

commodities as "supplies or raw materials" provided to the builder of a house that

the seller knows will be used for an unlawful purpose.[152]

On the other hand, in *The Zyklon B Case*, the Tribunal found Bruno

Tesch, the owner of a firm that had manufactured and sold the poison gas used in

the gas chambers in Nazi concentration camps, guilty of aiding and abetting

crimes against humanity.[153]   Specifically, the Tribunal heard evidence that Tesch

had both supplied Zyklon B and "undertook to train the S.S. men in this new

method of killing human beings."[154]   However, the Judge Advocate – the neutral

---

[150]    *See The Ministries Case* at 621-22.

[151]    *Id.* at 621.

[152]    *Id.*

[153]    *See Trial of Bruno Tesch and Two Others* ("*The Zyklon B Case*"), *in* 1 *Law Reports of Trials of War Criminals* 93-103 (1947).

[154]    *Id.* at 95.

legal advisor to the court in a British military tribunal[155] – summed up the
necessary act to prove aiding and abetting as merely supplying the gas used to
execute allied nationals.[156]

The distinction between these two cases is the quality of the
assistance provided to the primary violator.  Money is a fungible resource, as are
building materials.  However, poison gas is a killing agent, the means by which a
violation of the law of nations was committed.  The provision of goods
specifically designed to kill, to inflict pain, or to cause other injuries resulting
from violations of customary international law bear a closer causal connection to
the principal crime than the sale of raw materials or the provision of loans.[157]
Training in a precise criminal use only further supports the importance of this link.
Therefore, in the context of commercial services, provision of the means by which

---

[155]    *See* British Royal Warrant of June 14, 1945, § 5, *reprinted in* Telford
Taylor, Final Report to the Secretary of the Army on the Nuremberg War Crimes
Trials Under Control Council Law No. 10, at 255 (1949).

[156]    *See The Zyklon B Case* at 101.

[157]    Although such goods may have legitimate uses, that issue is
addressed by the *mens rea* element. *Compare The Zyklon B Case* at 142
(convicting an individual who provided poison gas to the S.S. knowing its
intended use), *with United States v. Krauch* ("*The I.G. Farben Case*"), *in* 8 *Trials
of War Criminals Before the Nuernberg Military Tribunals*, at 1168 (1952)
(acquitting employees of I.G. Farben who sold poison gas to the S.S. believing
that it would be used for delousing).

a violation of the law is carried out is sufficient to meet the *actus reus* requirement of aiding and abetting liability under customary international law.[158]

## 2.   *Mens Rea*

Even assuming that this Court would adopt secondary liability standards from customary international law, the parties still dispute what level of *mens rea* is necessary under the law of nations to prove aiding and abetting liability. Defendants argue that liability requires proof that an accomplice *intended* to further the primary violation of the law of nations.[159] Plaintiffs claim that even under customary international law, mere *knowledge* that the accomplice's acts will provide substantial assistance to the primary violation is sufficient.[160]

The vast majority of international legal materials clearly prescribe knowledge as the *mens rea* requirement for aiding and abetting. The ICTY set forth this standard most succinctly, requiring "knowledge that [the aider or

---

[158]   The Rome Statute further supports this distinction. *See* Rome Statute art. 25(c) (noting that "providing the means for [a crime's] commission" is one example of aiding, abetting, or otherwise assisting a violation of the law of nations).

[159]   *See* Def. Mem. at 20-23.

[160]   *See* Pl. Mem. at 23-27.

45

abettor's] actions will assist the perpetrator in the commission of the crime."[161]

Despite the clear prevalence of the knowledge standard, this Court must adhere to

the restrictive approach to *mens rea* laid out in Judge Katzmann's *Khulumani*

concurrence; in the presence of a substantial conflict in authority, this Court must

---

[161]     *Furundzija* ¶ 245. *Accord, e.g., Prosecutor v. Vasiljevic*, Case No.
IT-98-32-A, Appeals Judgment ¶ 102 (Feb. 25, 2004) ("In the case of aiding and
abetting, the requisite mental element is knowledge that the acts performed by the
aider and abettor assist the commission of the specific crime by the principal.");
*Prosecutor v. Akayesu*, No. ICTR-96-4-T ¶ 545 (Dec. 10, 1998) ("[A]n accused is
liable as an accomplice to genocide if he knowingly aided or abetted or instigated
one or more persons in the commission of genocide, while knowing that such a
person or persons were committing genocide, even though the accused himself did
not have the specific intent to destroy, in whole or in part, a national, ethnical,
racial or religious group, as such."); *Tadic I* ¶¶ 674, 692 (May 7, 1997) (requiring
knowing participation or "a conscious decision to participate" via the provision of
substantial assistance); *United States v. Flick, in* 6 *Trials of War Criminals Before
the Nuernberg Military Tribunals* 1217 (1952) ("One who knowingly by his
influence and money contributes to the support [of a violation of the law of
nations] thereof must, under settled legal principles, be deemed to be, if not a
principal, certainly an accessory to such crimes."); *United States v. Ohlendorf, in* 4
*Trials of War Criminals Before the Nuernberg Military Tribunals* 569 (1949)
(convicting an individual who had provided a list of communists because "he was
aware that the people listed would be executed when found"); *The Zyklon B Case*
at 101 (describing liability as requiring "that the accused knew that the gas was to
be used for the purpose of killing human beings"); *Draft Code of Crimes Against
the Peace and Security of Mankind*, [1996] 2 Y.B. Int'l L. Comm'n., ch. 2, arts.
2(3)(d), 17, 18, 20, U.N. Doc. A/CN.4/SER.A/1996/Add.l (Part. 2). *See generally*
Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations:
Confusion in the Courts*, 6 Nw. U. J. Int'l Hum. Rts. 304, 314 (2008) ("[T]he
majority of the post-World War II case law, case law of the ICTY and the ICTR,
the [International Law Commission] Draft Code, and group crimes under article
25(3)(d) of the [Rome] Statute, requires that those who aid and abet merely have
*knowledge* that they are assisting criminal activity.").

set the requirement at a level where all major sources of customary international law would "authorize the imposition of such liability."[162]  "The critical question is whether there is a discernable core definition that commands the same level of consensus as the 18th-century crimes identified by the Supreme Court in *Sosa*."[163] This lowest-common-denominator approach also prevents the imposition of liability in American courts that might not be ordered in an alternative forum.

The acquittal in *The Ministries Case* does not disturb the universal knowledge requirement found in international jurisprudence.  The Military Tribunal found that Rasche had knowledge "as to the purpose for which the loan [was] sought, and how it [was] to be used."[164]  However, the acquittal did not rest on the absence of criminal intent.  The Tribunal never discussed whether facilitation of a loan with express intent to further the crimes of the S.S. would create criminal liability, indicating that the *mens rea* was not pivotal.  Rather, the Tribunal focused on the nature of the act, stating, "[W]e are not prepared to state

---

[162]     *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring).

[163]     *Id.* at 276 n.12 (Katzmann, J., concurring) (citing *Sosa*, 542 U.S. at 732).

[164]     *The Ministries Case* at 622.

that such loans constitute a violation of that law."[165]  In other words, the Tribunal

acquitted Rasche for not having met the *actus reus* requirement of aiding and

abetting.  Moreover, with regard to different defendants in the same case, the

Tribunal stated, "The question is whether they *knew* of the program and whether in

any substantial manner they aided, abetted, or implemented it."[166]  Thus *The*

*Ministries Case* does not deviate from the standard *mens rea* requirement found in

customary international law.

Nor did the *Akayesu* decision of the ICTR reach a contrary result.

*Akayesu* noted that because of the nature of the crime of genocide, the act of

aiding and abetting one who commits genocide could itself be considered an act of

genocide, rather than an instance of secondary liability.[167]  Because genocide is a

specific intent crime,[168] when the act of aiding or abetting genocide constitutes a

primary violation, specific intent is required.[169]  Nevertheless, *Akayesu* expressly

---

[165]     *Id.  Accord id.* ("The real question is, is it a crime to make a loan,
knowing or having good reason to believe that the borrower will use the funds in
financing enterprises which are employed in using labor in violation of either
national or international law?").

[166]     *Id.* at 478 (emphasis added).

[167]     *See Akayesu* ¶ 485.

[168]     *See id.* ¶ 498.

[169]     *See id.* ¶ 485.

recognized the general rule that secondary liability for aiding and abetting under customary international law requires only knowledge of the crimes of the primary actor.[170]

The Rome Statute of the International Criminal Court presents the most difficult question concerning the universality of the knowledge standard for aiding and abetting under customary international law.  Article 25(c) of the Rome Statute creates criminal liability for an individual who "*[f]or the purpose of* facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission."[171]  On this basis, Judge Katzmann stated that the only conduct universally condemned with the degree of certainty required by *Sosa* is the provision of substantial assistance by an aider and abettor who shares the primary

---

[170]     *See id.* ¶ 545 ("[A]n accused is liable as an accomplice to genocide if he knowingly aided or abetted or instigated one or more persons in the commission of genocide, while knowing that such a person or persons were committing genocide, even though the accused himself did not have the specific intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such."). *See also id.* ¶ 489 (noting that "criminal intent is a moral element required for any crime" but holding that even "negligence so serious as to be tantamount to acquiescence" is sufficient to meet that standard).

[171]     Rome Statute art. 25(c) (emphasis added).

49

violator's intent.[172]

However, Judge Katzmann recognized that the Rome Statute "has yet to be construed by the International Criminal Court" and that "its precise contours and the extent to which it may differ from customary international law thus remain somewhat uncertain."[173] The Rome Statute was not intended to eliminate rights existing under the law of nations;[174] therefore in most cases the Statute codifies rather than modifies previously existing and clearly established customary international law.[175] Nevertheless, where the Rome Statute *explicitly* deviates from the law of nations, it is fair to assume that those rules are unique to the ICC,

---

[172] *See Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring). *See also id.* at 333 (Korman, J., concurring in part and dissenting in part) (stating that if aiding and abetting were criminalized under customary international law, this would be the standard).

[173] *Id.* at 275-76 (Katzmann, J., concurring).

[174] *See* Rome Statute art. 10. *See also* Janet Halley, *Rape at Rome: Feminist Interventions in the Criminalization of Sex-Related Violence in Positive International Criminal Law*, 30 Mich J. Int'l L. 1, 41 (2008) ("The legitimacy of the ICC also rested in part on the representation of the Rome Statute as merely a codification of existing humanitarian law.").

[175] *See generally Khulumani*, 504 F.3d at 276 (Katzmann, J., concurring) ("[The Rome Statute] may therefore be taken 'by and large . . . as constituting an authoritative expression of the legal views of a great number of States.'" (quoting *Furundzija*, ¶ 277)); *Furundzija* ¶ 227 (noting that the Rome Statute is an expression of customary international law with some specific deviations).

rather than a rejection of customary international law.[176] There is no explicit

deviation in the Rome Statute with regard to aiding and abetting liability. Article

25(c) can reasonably be interpreted to conform to pre-Rome Statute customary

international law.

"It remains unclear whether "purpose" [in Article 25(c)] means sole

purpose, primary purpose, or simply purpose as inferred from knowledge of likely

consequences."[177] As one prominent scholar has explained, a secondary purpose

can be inferred from knowledge of the likely consequences of an act.[178] This logic

is particularly prominent in the case of a person or corporation who provides the

means by which a crime in violation of the law of nations is carried out, as the

---

[176]    A derogation in the Rome Statute from customary international law
"is considered a *lex specialis* in relation to the general principle" rather than a
modification of customary international law. Paola Anna Pillitu, *European
"Sanctions" Against Zimbabwe's Head of State and Foreign Minister: A Blow to
Personal Immunities of Senior State Officials*, 1 J. Int'l Crim. Just. 453, 457 n.18
(2003). *Accord* Beth Van Schaack, *Crimen Sine Lege: Judicial Lawmaking at the
Intersection of Law and Morals*, 97 Geo. L.J. 119, 177 n.298 (2008) ("[T]he
relatively static Statute may not reflect existing CIL and should not 'chill' the
continuing process of CIL development."); Mohamed M. El Zeidy, *Critical
Thoughts on Article 59(2) of the ICC Statute*, 4 J. Int'l Crim. Just. 448, 454 (2006)
(noting that detailed arrest procedures in the Rome Statute are not drawn from
customary international law and are therefore specific to the ICC).

[177]    Chimène I. Keitner, *Conceptualizing Complicity in Alien Tort Cases*,
60 Hastings L.J. 61, 88 (2008) (citing Cassel, *supra*, at 312).

[178]    *See* Cassel, *supra*, at 312.

primary purpose – profit – is furthered by the success of an ongoing crime.  Thus it

may reasonably be inferred that an arms dealer providing weapons to perpetrators

of a genocide tacitly supports the genocide, as it creates demand for that increases

profit.[179]

Moreover, Article 25(c) does not exist in isolation.[180]  Article 30 –

entitled "Mental State" – provides that:

> A person has intent where: (a) In relation to conduct, that
> person means to engage in the conduct; [and] (b) In
> relation to a consequence, that person means to cause that
> consequence *or is aware* that it will occur in the ordinary
> course of events.[181]

Thus even assuming that "*[f]or the purpose of* facilitating commission of such a

crime" in Article 25(c) carries an intent requirement, within the context of the

---

[179]    Such secondary purpose can be implied in the seminal *Zyklon B Case*,
where the prosecutors "did not attempt to prove that the accused acted with the
intention of assisting the killing of the internees." *Furundzija*, ¶ 238.  "The charge
as accepted by the court was that they knew what the buyer in fact intended to do
with the product they were supplying." *Id. Cf. The Ministries Case* at 622
(finding mere knowledge and not referencing secondary purpose where the
acquittal turned on the absence of a sufficiently criminal act).

[180]    This Court must look to the text of the treaty as a whole in order to
interpret its meaning. *See Air France v. Saks*, 470 U.S. 392, 396-37 (1985) ("The
analysis [of a treaty] must begin, however, with the text of the treaty and the
context in which the written words are used.").

[181]    Rome Statute art. 30(2) (emphasis added).

Rome Statute "intent" does not require that an aider or abettor share the primary

actor's purpose. The *actions* must be taken intentionally: there is no liability for

the provision of assistance under duress.[182]  But the aider or abettor may be held

liable if he or she *is aware* that the assistance provided will substantially assist the

commission of crimes in violation of the law of nations.  The portion of the *mens*

*rea* requirement related to the outcome – rather than the act – is in fact identical to

the Rome Statute's definition of knowledge: "awareness that a circumstance exists

or a consequence will occur in the ordinary course of events."[183]  Under the Rome

Statute – and under customary international law – there is no difference between

amorality and immorality.  One who substantially assists a violator of the law of

nations is equally liable if he or she desires the crime to occur or if he or she

knows it will occur and simply does not care.

Therefore, there are no applicable international legal materials

requiring a finding of specific intent before imposing liability for aiding and

---

[182]     *Cf. Negusie v. Holder*, 129 S. Ct. 1159 (2009) (remanding the case to
the Board of Immigration Appeals to determine whether coercion or distress is
relevant to the " persecutor bar" to asylum status under the Immigration and
Nationality Act); *id.* at 1174 (Stevens, J., concurring) ("I think it plain that the
persecutor bar does not disqualify from asylum or withholding of removal an alien
whose conduct was coerced or otherwise the product of duress.").

[183]     Rome Statute art. 30(3).

abetting a violation of customary international law.  As a result, I conclude that customary international law requires that an aider and abettor know that its actions will substantially assist the perpetrator in the commission of a crime or tort in violation of the law of nations.[184]

## C.    Conspiracy

The Second Circuit's decision in *Khulumani* did not provide guidance concerning conspiratorial liability in ATCA cases.  I again look to customary international law as the source of relevant authority.  In *Prosecutor v. Tadic*, the ICTY recognized Joint Criminal Enterprise as a crime derived from customary international law and comparable to conspiracy.[185]  However, the ICC has repeatedly declined to apply a broad notion of conspiratorial liability under customary international law.[186]  Jurists from the civil law tradition have long

---

[184]    Notably, a corporation is imputed to share the *mens rea* of employees acting within the scope of their authority.  *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989).  *See also United States v. Ionia Mgmt., S.A.*, 555 F.3d 303, 309-10 (2d Cir. 2009) (applying *Twentieth Century Fox* and rejecting a limitation to "managerial" employees).

[185]    *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment ("*Tadic II*") ¶¶ 227-228 (July 15, 1999).

[186]    *See, e.g., Prosecutor v. Thomas Lubanga Dyilo*, Situation in the Democratic Rep. of Congo, ICC-01/04-01/06-803-tEN, ICC Pre-Trial Chamber Decision on the Confirmation of Charges ¶¶ 326-338 (Jan. 29, 2001).

resisted the application of conspiracy to crimes under the law of nations, as

conspiracy is an Anglo-American legal concept.[187]   Importantly, the Supreme

Court recently stated in *Hamdan v. Rumsfeld* that the law of war provides liability

only for "conspiracy to commit genocide and common plan to wage aggressive

war."[188]   While *Hamdan* did not address the ATCA, this Court must nevertheless

apply the Supreme Court's assessment of the law of nations. *Sosa* requires that

this Court recognize only forms of liability that have been universally accepted by

the community of developed nations.  Conspiracy does not meet this standard.

Therefore, this Court declines to recognize conspiracy as a distinct tort to be

applied pursuant to ATCA jurisdiction.

## VII.  SPECIFIC AIDING AND ABETTING CLAIMS

Only plaintiffs' aiding and abetting claims survive the foregoing

---

[187]     *See, e.g.*, Geert-Jan Alexander Knoops, *The Proliferation of the Law of International Criminal Tribunals Within Terrorism and "Unlawful" Combatancy Trials After* Hamdan v. Rumsfeld, 30 Ford. Int'l L.J. 599, 613 (2007) (describing opposition from civil-law jurists dating back to the Nuremberg Tribunals).

[188]     *See* 584 U.S. 557, 610-12 (2006) (plurality op.), *superseded by statute on other grounds as stated in Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008). *See also Presbyterian Church of Sudan v. Talisman Energy, Inc.* ("*Talisman III*"), 453 F. Supp. 2d 633, 664-65 (S.D.N.Y. 2006), *appeal pending* No. 07-0016 (2d Cir. argued Jan. 12, 2009) (noting the limits of conspiratorial liability under customary international law).

analysis of direct and secondary liability.  I now turn to an analysis of each claim.

I analyze each Complaint separately, as allegations of particular actions vary a

great deal between the two Complaints.[189]

### A.    The *Ntsebeza* Complaint

The *Ntsebeza* Complaint does not merely allege that defendants

engaged in commerce with a pariah state.  Rather, the *Ntsebeza* plaintiffs allege

that "many corporations, including Defendants, provided essential assistance to

the apartheid state . . . knowing that such assistance would lead directly to the

violation of the human rights of black South Africans."[190]

### 1.    The Automotive Defendants

Although the allegations against each defendant must be assessed

individually, the *Ntsebeza* plaintiffs have made sufficiently similar allegations

against the three automotive companies that they may be discussed together.  In

sum, plaintiffs have adequately pled allegations against Daimler, Ford, and GM to

sustain claims for aiding and abetting apartheid, torture, extrajudicial killing, and

---

[189]     *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 780 n.2 (S.D.N.Y. 2005) (noting the submission of separate motions to dismiss separate actions in a multi-district litigation unless those actions were "materially identical").

[190]     *Ntsebeza* Complaint ¶ 53.

CIDT.

First, plaintiffs allege that Daimler, Ford, and GM security personnel were intimately involved in the torture and CIDT of several plaintiffs. Specifically, plaintiffs allege that management provided information about anti-apartheid activists to the South African Security Forces, facilitated arrests, provided information to be used by interrogators, and even participated in interrogations.[191] The provision of names of anti-apartheid activists to the South African Government satisfies the *actus reus* requirement of torture and CIDT, as it allowed the Government to target those who opposed its rule. Moreover, the automotive companies undoubtedly knew what would happen to those whose names they provided,[192] and the direct participation of company personnel in interrogation – if not torture – only further supports the presence of sufficient *mens rea*.

Next, plaintiffs allege that Daimler, Ford, and GM aided and abetted extrajudicial killing through the production and sale of specialized military

---

[191]     *See id.* ¶¶ 56-58, 61 (Daimler); *id.* ¶¶ 89-91 (GM); *id.* ¶¶ 110, 119-122 (Ford).

[192]     *Cf. Ohlendorf*, at 569 (finding defendant guilty of aiding and abetting Nazi war crimes by turning over a list of individuals who he knew "would be executed when found").

57

equipment.  Plaintiffs allege that the automotive defendants sold heavy trucks,

armored personnel carriers, and other specialized vehicles to the South African

Defense Forces and the Special Branch, the South African police unit charged

with investigating anti-apartheid groups.[193]  These vehicles were the means by

which security forces carried out attacks on protesting civilians and other anti-

apartheid activists;[194] thus by providing such vehicles to the South African

Government, the automotive companies substantially assisted extrajudicial killing.

Plaintiffs have also alleged that defendants were fully aware of the crucial role that

their vehicles played in the violent suppression of anti-apartheid activities.[195]

Specifically, employees at each company allegedly protested the use of products

they built to suppress apartheid.[196]  The companies allegedly acknowledged this

protest but responded by stating that "it was a duty of all South Africans to support

the security forces"[197] or that all protestors "would be assumed to be members of

---

[193]    *See Ntsebeza* Complaint ¶¶ 64-65 (Daimler); *id.* ¶¶ 85-86 (GM); *id.* ¶
104 (Ford).

[194]    *See id.* ¶¶ 68-76 (Daimler); *id.* ¶ 85-87 (GM); *id.* ¶ 104 (Ford).

[195]    *See id.* ¶ 67 (Daimler); *id.* ¶ 88 (GM); *id.* ¶ 104 (Ford).

[196]    *See id.* ¶ 66 (Daimler); *id.* ¶ 87 (GM); *id.* ¶ 105 (Ford).

[197]    *Id.* ¶ 66 (Daimler).

the African National Congress"[198] or by retaliating against protestors.[199]  Through

these allegations, plaintiffs have adequately pled that defendants knew that the

sale of military vehicles would substantially assist the South African Government

in carrying out extrajudicial killings.

In combination, the violations of customary international law that the

automotive companies allegedly aided and abetted constitute apartheid.  As

described above, the crime of apartheid under customary international law is the

commission of inhumane acts in the context of systemic racial oppression.

Plaintiffs have undoubtedly pled that the inhumane acts that the automotive

companies allegedly aided and abetted occurred because of and in the context of

apartheid.[200]  It is beyond cavil that the automotive companies were aware of the

crimes of apartheid.  Therefore, the *Ntsebeza* Complaint adequately pleads that the

automotive defendants aided and abetted apartheid, torture, extrajudicial killing,

and CIDT.

### 2.    International Business Machines Corporation

The *Ntsebeza* plaintiffs have pled that IBM aided and abetted the

---

[198]    *Id.* ¶ 87 (GM).

[199]    *See id.* ¶ 105 (Ford).

[200]    *See id.* ¶¶ 41-54.

South African Government's denationalization of black South Africans through the provision of computers, software, training, and technical support.  Not every violation of the law of nations involves killing, and therefore not every commercial entity that aids and abets violations of customary international law need provide a gun, a tank, or poison gas.  Specifically, IBM allegedly sold the South African Government – along with the governments of the bantustans Bophuthatswana, Gazankulu, KwaZulu, Lebowa, Transkei, and Venda – computers used to register individuals, strip them of their South African citizenship, and segregate them in particular areas of South Africa.[201]  More importantly, IBM employees also assisted in developing computer software and computer support specifically designed to produce identity documents and effectuate denationalization.[202]  Such customized computerized systems were indispensable to the organization and implementation of a system of geographic segregation and racial discrimination in a nation of millions.  Moreover, the records necessary to deliberately denationalize a large proportion of black South Africans were generated using equipment allegedly provided by IBM.  Therefore, the *Ntsebeza* plaintiffs have adequately alleged the *actus reus* for aiding and

---

[201]     *See id* ¶¶ 133-135, 137.

[202]     *See id.* ¶¶ 134-135, 137.

abetting both arbitrary denationalization and the broader crime of apartheid.

Plaintiffs have alleged that IBM knew how its products were being used by the South African Government and that IBM engaged in subterfuge to avoid public recriminations and an American embargo.[203] While the direct allegations of knowledge are somewhat thin, given that IBM provided the programming expertise as well as the hardware, there is a plausible inference that the company understood the nature of the projects it assisted. Therefore, the *Ntsebeza* plaintiffs have adequately alleged the *mens rea* for aiding and abetting both arbitrary denationalization and apartheid.

However, the *Ntsebeza* plaintiffs have not pled allegations sufficient to sustain a claim of aiding and abetting CIDT against IBM. Although theoretically the identity documents created through the use of IBM computers and software helped target individuals found outside of permitted geographic areas for CIDT, computers were not an essential element of CIDT or the means by which it was carried out. Thus the *Ntsebeza* plaintiffs have not met the *actus reus* requirement for aiding and abetting CIDT. Nor does CIDT inevitably flow from geographic segregation decrees enforced through the use of identity cards produced using IBM computers. Therefore, the *Ntsebeza* plaintiffs also fail to

---

[203]    *See id.* ¶¶ 139-140.

meet the *mens rea* requirement, even allowing all reasonable inferences in their favor. The *Ntsebeza* plaintiffs' claim that IBM aided and abetted CIDT is therefore dismissed.

### 3.    Barclays Bank PLC

The *Ntsebeza* plaintiffs' claims against Barclays rest on the employment practices of the bank.[204] Although the systemic denial of job opportunities on the basis of race is abhorrent, Barclays' employment practices do not meet the *actus reus* requirement of aiding and abetting apartheid. Barclays' hiring patterns were aligned with geographic segregation already established by the South African Government. The employment practices were more akin to acquiescence to – rather than the provision of essential support for – apartheid. Nor do the claims against Barclays relate to mistreatment of individuals detained by the South African Government. Therefore, the *Ntsebeza* plaintiffs' claims that Barclays aided and abetted apartheid and CIDT are dismissed.

### B.    The *Khulumani* Complaint

The *Khulumani* plaintiffs similarly do not assert claims against defendants merely for doing business with the South African Government. Rather plaintiffs claim that defendants supplied military material, computer expertise and

---

[204]    *See id.* ¶¶ 143-145.

financing that had a "substantial effect" on the commission of crimes in violation of the law of nations.[205]

### 1.    Automotive Defendants

The *Khulumani* plaintiffs allege that the automotive defendants supplied vehicles, parts, and other equipment "used to patrol townships to target political opponents, repress the African population, quell public displays of dissent, and brutalize and kill many citizens as described herein."[206]  As discussed below, these allegations are sufficient to maintain claims for aiding and abetting extrajudicial killing and apartheid against Daimler but not against GM or Ford; they do not meet the *actus reus* requirement for aiding and abetting against any of the automotive defendants for the various other crimes alleged.

Specifically the *Khulumani* plaintiffs allege that Daimler sold "Unimog" military vehicles to the South African Government, as well as components of the "Casspir" and "Buffel" vehicles that were used by internal security forces.[207]  These vehicles were allegedly used to patrol the townships and

---

[205]    *Khulumani* Complaint ¶¶ 1-2.

[206]    *Id.* ¶¶ 254, 256.

[207]    *See id.* ¶¶ 256-263.

their military fittings were used to carry out extrajudicial killings.[208] As the vehicles were the means by which the South African Defense Forces killed black South Africans as part of the maintenance of a system of state-sponsored apartheid, the allegations satisfy the *actus reus* requirement of aiding and abetting both extrajudicial killing and apartheid.

One Daimler employee allegedly reported to a shareholder meeting that Daimler provided parts for a vehicle used "for the occupation and control of black urban settlements."[209] Moreover, Daimler allegedly acknowledged the service and repair relationship between its subsidiary Mercedes Benz Exchange Unit Services and the South African military but stated that it "was strictly confidential."[210] Moreover, the *Khulumani* plaintiffs allege that Daimler knew the vehicles and components it exported fell within the United Nations Security Council's ban on the export of military equipment to South Africa.[211] Finally, the *Khulumani* plaintiffs broadly allege that Daimler knew that the equipment it

---

[208]   *See id.* ¶¶ 24, 264.

[209]   *Id.* ¶ 281.

[210]   *Id.* ¶¶ 282-283.

[211]   *See id.* ¶ 258.

provided would be used to carry out violations of the law of nations.[212]  In the

context of the specific allegations made against Daimler, this broad allegation

plausibly satisfies the *mens rea* requirement of aiding and abetting extrajudicial

killing and apartheid.

On the other hand, Daimler did not "acquire a stake in the criminal

venture that was the apartheid regime"[213] through the sale of military equipment to

the South African Government.  The sale of vehicles does not satisfy the *actus*

*reus* requirement of aiding and abetting torture, prolonged unlawful detention, and

CIDT.  Therefore, these claims are dismissed.

Moreover, the *Khulumani* plaintiffs' allegations concerning Ford and

GM are simply too similar to ordinary vehicle sales to meet the *actus reus*

requirement of aiding and abetting violations of customary international law.  For

example, Ford allegedly sold "passenger vehicles" and "F series U.S.-origin trucks

to the police."[214]  Similarly, GM allegedly sold "cars and trucks to police and

military agencies in South Africa" and after the imposition of export restrictions

continued to sell "commercial vehicles – primarily small trucks – to the security

---

[212]     *See id.* ¶ 289.

[213]     *Id.* ¶ 300.

[214]     *Id.* ¶¶ 267-268.

forces."[215]  The sale of cars and trucks without military customization or similar

features that link them to an illegal use does not meet the *actus reus* requirement

of aiding and abetting a violation of the law of nations.[216]  While GM or Ford may

have violated American export controls, the allegations do not amount to a tort

cognizable under the ATCA.  The *Khulumani* plaintiffs' claims that Ford and GM

aided and abetted extrajudicial killing, torture, prolonged unlawful detention,

CIDT, and apartheid are dismissed.  However, given the relative similarity

between the *Khulumani* plaintiffs' conclusory extrajudicial killing and apartheid

claims and the *Ntsebeza* plaintiffs' specific allegations, the *Khulumani* plaintiffs

will be permitted to file an amended complaint conforming their allegations to

---

[215]     *Id.* ¶¶ 276-277.

[216]     Although the *Khulumani* plaintiffs do offer omnibus allegations that
the three automotive defendants "supplied [vehicles] to the South African security
forces . . . designed to enable the security forces to track and attack civilians,
patrol communities, and terrorize the Black population," this statement treats the
three defendants as a unit.  *Id.* ¶ 298.  Moreover, the allegation that the three
automotive defendants uniformly supplied "armored tanks equipped with machine
gun mounts and other types of military vehicles," *id.*, and vehicles "pre-equipped
with armor and military fixtures" is contradicted by the specific allegations
concerning GM and Ford.  *See, e.g., id.* ¶¶ 267-268 (describing Ford's sales as "F-
series trucks" and "passenger vehicles").  Because this Court must assess the
allegations against each defendant separately, I do not consider these uniform
assertions with regard to claims against each of the individual defendants.

those in the *Ntsebeza* Complaint with regard to the claims against GM and Ford.[217]

## 2.    The Technology Defendants

The *Khulumani* plaintiffs next allege that defendants IBM and Fujitsu supplied computer equipment "designed to track and monitor civilians with the purpose of enforcing the racist, oppressive laws of apartheid."[218]  Specifically, IBM allegedly supplied computers to the South African Department of the Interior with a "specially-designed, computerized population registry," including "the software and database design as well as the hardware to run the system."[219] This system "was used to track racial classification and movement for security purposes" and was essential in "implementing and enforcing the racial pass laws and other structural underpinnings of the apartheid system."[220]  Similarly, the *Khulumani* plaintiffs allege that Fujitsu – through a subsidiary formerly known as International Computers Limited – "developed an automated database of information on South Africa's Black population" designed specifically "to

---

[217]    If the allegations in the amended *Khulumani* Complaint are similar to those made in the *Ntsebeza* Complaint, the outcome of any motion to dismiss will be the same.  Although I recognize defendants' need to preserve their objection, this need not be done through extensive briefing.

[218]    *Id.* ¶ 248.

[219]    *Id.* ¶¶ 233.

[220]    *Id.* ¶¶ 234-235.

facilitate the government's implementation of the racial pass system."[221]  These

allegations describe provision of the means by which the South African

Government carried out both racial segregation and discrimination; thus they meet

the *actus reus* requirement of aiding and abetting apartheid.

Moreover, the alleged specificity of the systems designed by both

IBM and Fujitsu provides a strong inference that the technology companies knew

that use of the computer hardware and software they supplied would inexorably

support the commission of the crimes of apartheid.  Moreover, plaintiffs

specifically allege that IBM and Fujitsu worked through a front corporation to

mask their business with the South African Government.[222]  Specifically, IBM

allegedly conceded that its equipment and services might be used for repressive

purposes but stated, "It's not really our policy to tell our customers how to conduct

themselves."[223]  That level of willful blindness in the face of crimes in violation of

the law of nations cannot defeat an otherwise clear showing of knowledge that the

assistance IBM provided would directly and substantially support apartheid.

Therefore, plaintiffs have adequately pled that IBM and Fujitsu aided and abetted

---

[221]     *Id.* ¶¶ 215-216.

[222]     *See id.* ¶ 228 (Fujitsu); *id.* ¶ 241 (IBM).

[223]     *Id.* ¶ 242.

the commission of apartheid by the Government of South Africa.

However, not every computer system provided to the Government of South Africa or South African defense contractors is sufficiently tied to violations of customary international law. Although IBM allegedly sold computer systems to numerous government agencies, the mere sale of computers to the Department of Prisons – despite the widely held knowledge that political prisoners were routinely held and tortured without trial[224] – does not constitute substantial assistance to that torture. Similarly, IBM allegedly rented computers to Leyland-South Africa and African Explosives and Chemical Industries Ltd., two armaments manufacturers crucial to the South African Defense Forces.[225] However, the sale of equipment used to enhance the logistics capabilities of an arms manufacturer is not the same thing as selling arms used to carry out extrajudicial killing; it is merely doing business with a bad actor. Although more closely related to the violations of the law of nations at issue, even the sale of computers to the South African Defense Forces does not constitute aiding and abetting any and all violations of customary international law that the military committed, as computers are not the means by which those violations were carried out. Most broadly, "sustaining the apartheid

---

[224]    *See id.* ¶ 237.

[225]    *See id.* ¶ 240.

69

regime"[226] does not render the technology defendants liable for aiding and abetting all violations of the law of nations committed in apartheid-era South Africa. Therefore, the *Khulumani* plaintiffs' claims that the technology defendants aided and abetted extrajudicial killing, torture, prolonged unlawful detention, and CIDT are dismissed.

### 3.    Banking Defendants

The *Khulumani* plaintiffs' claims against Barclays and UBS stem primarily from the provision of loans by the two banks and the purchase of South African defense forces bonds.[227]  As described above, supplying a violator of the law of nations with funds – even funds that could not have been obtained but for those loans – is not sufficiently connected to the primary violation to fulfill the *actus reus* requirement of aiding and abetting a violation of the law of nations. The *Khulumani* plaintiffs additionally assert that Barclays aided and abetted apartheid by permitting one of its directors to serve on an advisory board to the South African Defense Forces.[228]  However, not every action taken by a corporate

---

[226]    *Id.* ¶ 230.

[227]    *See id.* ¶¶ 149, 152, 156, 158-167, 169, 171.

[228]    *See id.* ¶¶ 153-155.

director is within the scope of his or her employment.[229]  The *Khulumani* plaintiffs

have not alleged that the Barclay's director served on the board as a Barclays

representative.  Moreover, even assuming that the Barclays director served in an

official capacity, service on an advisory board concerning the use of "business

methods" "to assist in the implementation" of apartheid[230] is simply too attenuated

from the commission of apartheid to fulfill the *actus reus* requirement of aiding

and abetting.  Therefore, the *Khulumani* plaintiffs' claims that Barclays and UBS

aided and abetted apartheid, extrajudicial killing, torture, prolonged unlawful

detention, and CIDT are dismissed.

### 4.    Rheinmetall Group A.G.[231]

The *Khulumani* plaintiffs allege that Rheinmetall Group "exported

---

[229]     *Cf., e.g., Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 962 (N.D. Ill. 2002) (holding that a corporation is liable for acts taken by a director within the scope of his or her authority); *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129, 130 (Tex. 1968) (holding that a corporation is liable for libelous statements of a director when those statements were made in the scope of the director's duties).

[230]     *Khulumani* Complaint ¶¶ 153-154.

[231]     Although Rheinmetall did not join in defendants' joint motion to dismiss, I will briefly discuss the viability of the *Khulumani* plaintiffs' claims against Rheinmetall for the sake of completeness and efficiency.  As neither plaintiffs nor defendants addressed claims in their papers, this prejudices neither Rheinmetall nor the *Khulumani* plaintiffs.  Moreover, Rheinmetall retains the right to move to dismiss should its jurisdictional motion be denied.

significant quantities of armaments and related equipment and expertise to South

Africa" knowing that this war material would be used to commit extrajudicial

killing.[232]  Plaintiffs allege that Rheinmetall thereby provided the direct means by

which the South African Government carried out extrajudicial killings in the

context of and in order to sustain state-based racial segregation.[233]  These

allegations would satisfy the *actus reus* requirement of aiding and abetting

extrajudicial killing and apartheid.  The *Khulumani* plaintiffs also allege that

Rheinmetall used fraudulent export declarations, fictitious foreign firms, and false

end-user declarations to transport armaments to South Africa.[234]  Plaintiffs further

allege that the head of Oerlikon-Bührle – Dieter Bührle – complained to the Swiss

Government concerning the business implications of an arms embargo against

South Africa,[235] and that Oerlikon-Bührle used false end-user certificates to

---

[232]     *Id.* ¶¶ 181, 195, 198.  *Accord id.* ¶ 181 (machine guns and armored
personnel carriers); ¶¶ 182-185 (artillery); *id.* ¶ 190 (other armaments); *id.* ¶ 191
(anti-aircraft cannons and ammunition).

[233]     To sustain this claim, the *Khulumani* plaintiffs must eventually
demonstrate that the particular weapons provided by Rheinmetall and its
subsidiaries to the South African Government were used in the incidents of
extrajudicial killing alleged in the Complaint.

[234]     *See id.* ¶¶ 182, 186.

[235]     *See id.* ¶¶ 188-189.

circumvent export controls.[236] These allegations – together with conclusory allegations that Rehinmetall knew that weapons it produced would inevitably be used to carry out atrocities[237] – would be sufficient to meet the *mens rea* requirement of aiding and abetting extrajudicial killing and apartheid.

However, allegations that Rheinmetall sold armaments to the South African Defense Forces do not appear to be sufficiently linked to torture, prolonged unlawful detention, and CIDT to meet the *actus reus* requirement of aiding and abetting those offenses, and those claims are likely to be dismissed.[238]

## VIII. ALTER-EGO AND AGENCY

Five of the six remaining defendants – Daimler, GM, Ford, IBM, and Fujitsu – assert that they cannot be held liable for the actions alleged in the two Complaints because those acts are properly attributed to subsidiaries, indirect-subsidiaries, or affiliates.[239] Plaintiffs claim that liability is properly assessed

---

[236]     *See id.* ¶¶ 190-191.

[237]     *See id.* ¶¶ 196, 198.

[238]     A company that provides substantial assistance to a rogue nation does not "acquire a stake in the criminal venture of the . . . regime." *Id.* ¶ 197.

[239]     *See* Reply Memorandum in Support of Defendants' Motion to Dismiss ("Def. Reply") at 35.

against the parent companies through theories of alter ego or agency.[240]  The

quality of allegations concerning these theories varies among defendants and

between the two Complaints.

## A.     Applicable Law

Although the ATCA requires this Court to apply customary

international law whenever possible, it is necessary to rely on federal common law

in limited instances in order to fill gaps.[241]  This results in part from the historical

focus of international tribunals on criminal prosecutions rather than tort liability.

Piercing of the corporate veil reflects the protection provided to

business organizations by domestic law.[242]  Therefore, the question of alter ego

liability does not raise the same universality concerns as does the recognition of

individual torts under *Sosa*.[243]

---

[240]     *See* Pl. Mem. at 64.

[241]     *See* Beth Stephens, *Sosa v. Alvarez-Machain: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*, 70 Brook. L. Rev. 533, 560 (2004).

[242]     Although necessary formalities are established by the corporate law of the country of incorporation, the signs of an alter ego traditionally used by federal courts remain helpful in this analysis.

[243]     The broader concept of piercing the corporate veil has been recognized in the context of international law. *See, e.g.*, Francisco Orrego Vicuña, *The Protection of Shareholders Under International Law: Making State Responsibility More Accessible, in International Law Today: Essays in Memory of*

74

On the other hand, vicarious liability is clearly established under customary international law, obviating any concerns regarding universality.[244] In particular, command responsibility – the military analogue to holding a principal liable for the acts of an agent – was firmly established by the Nuremberg Tribunals.[245] However, the international law of agency has not developed precise standards for this Court to apply in the civil context.[246] Therefore, I will apply federal common law principles concerning agency.

### 1.    Piercing the Corporate Veil

"In some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close as to justify piercing the corporate veil and

---

*Oscar Schachter* 161, 162-63 (Maurizio Ragazzi ed., 2005).

[244]    *See, e.g.*, Nigel D. White & Sorcha MacLeod, *EU Operations and Private Military Contractors: Issues of Corporate and Institutional Liability*, 19 Eur. J. Int'l L. 965, 972 (2008) (quoting C.F. Amerasinghe, *Principles of the Institutional Law of International Organizations* 400 (2005)); M. Cherif Bassiouni, *The New Wars and the Crisis of Compliance with the Law of Armed Conflict by Non-State Actors*, 98 J. Crim. L. & Criminology 711, 774 (2008) (citing *Draft Articles on the Responsibility of States for Internationally Wrongful Acts, Report of the ILC on the Work of Its Fifty-third Session*, UN GAOR, 56th Sess., Supp. No. 10 at 43, U.N. Doc A/56/10 (June 9, 2001)).  The Second Circuit has previously applied an agency analysis in an ATCA case, although it assessed personal jurisdiction, which required the application of New York law. *See Wiwa*, 226 F.3d at 95-96.

[245]    *See* Control Council Law No. 10, art. II, *in* Taylor, *supra*, at 251.

[246]    Nor did the parties address this issue in their briefs.

holding one corporation legally accountable for the actions of the other."[247]

Courts pierce the corporate veil "to prevent fraud or other wrong, or where a

parent dominates and controls a subsidiary."[248]  Veil piercing determinations are

fact-specific and are highly sensitive to "the circumstances of each case."[249]  A

"parent corporation and its subsidiary lose their distinct corporate identities when

their conduct demonstrates a virtual abandonment of separateness."[250]

Factors that are relevant to determining whether a corporation's form

should be respected include:

> "(1) disregard of corporate formalities; (2) inadequate
> capitalization; (3) intermingling of funds; (4) overlap in
> ownership, officers, directors, and personnel; (5) common
> office space, address and telephone numbers of corporate
> entities; (6) the degree of discretion shown by the allegedly
> dominated corporation; (7) whether the dealings between
> the entities are at arms length; (8) whether the corporations
> are treated as independent profit centers; (9) payment or
> guarantee of the corporation's debts by the dominating
> entity, and (10) intermingling of property between the

---

[247]     *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

[248]     *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l*, 2 F.3d 24, 26 (2d Cir. 1993).

[249]     *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

[250]     *Thomson-CSF*, 64 F.3d at 778 (citing *Carte Blanche*, 2 F.3d at 29).

entities."[251]

Finally, "[q]uestions relating to the internal affairs of corporations . . . are generally decided in accordance with the law of the place of incorporation."[252]

### 2. Corporate Agency

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents . . . in the scope of their authority."[253] However, "a parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock."[254] The level of control necessary to form a principal-agent relationship between a parent company and subsidiary "defies resolution by 'mechanical formula[e],' for the

---

[251]   *MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

[252]   *United States v. Funds Held in the Name of or for the Benefit of Wetterer*, 210 F.3d 96, 105 (2d Cir. 2000) (citations omitted).

[253]   *Meyer v. Holley*, 537 U.S. 280, 285 (2003). *Accord Bowoto v. Chevron*, 312 F. Supp. 2d 1229, 1238 (N.D. Cal. 2004) ("A parent company can be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary."); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *13 n.14 (S.D.N.Y. Feb. 28, 2002).

[254]   Restatement (Third) of Agency § 1.01 cmt. f(2) (citing *United States v. Bestfoods*, 524 U.S. 51, 62 (1998)).

inquiry is inherently fact-specific."[255]  Under federal common law,

> the relationship of principal and agent does not obtain
> unless the parent has manifested its desire for the
> subsidiary to act upon the parent's behalf, the subsidiary
> has consented so to act, the parent has the right to exercise
> control over the subsidiary with respect to matters
> entrusted to the subsidiary, and the parent exercises its
> control in a manner more direct than by voting a majority
> of the stock in the subsidiary or making appointments to
> the subsidiary's Board of Directors.[256]

However, such evidence need not be directly proven.  Circumstantial evidence of a

principal-agent relationship includes the exclusive dedication of a subsidiary to

assisting the parent company, payment of the subsidiary's expenses by the parent

company, and requests for approval of the parent company for important decisions

---

[255]    *Transamerica Leasing, Inc. v. Republica de Venezuela*, 200 F.3d 843,
849 (D.C. Cir. 2000) (quoting *First National City Bank v. Banco Para El
Comercio Exterior de Cuba*, 462 U.S. 611, 633 (1983)).

[256]    *Id.* (citing Restatement (Second) of Agency § 1). *Accord Itel
Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702-03 (2d
Cir. 1990) (mandating a finding of express agency "'by written or spoken words or
other conduct of the principal which, reasonably interpreted, causes the agent to
believe that the principal desires him so to act on the principal's account'" or
implied agency through "'[a]pparent authority to do an act . . . created as to a third
person by written or spoken words or any other conduct of the principal which,
reasonably interpreted, causes the third person to believe that the principal
consents to have the act done on his behalf by the person purporting to act for
him'" (quoting Restatement (Second) of Agency §§ 26-27)).

by the subsidiary.[257]

Even if a purported agent lacks actual authority, a principal also "is liable if it ratified the illegal acts."[258]  "'Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'"[259] The acts of an agent are imputed to the principal

---

[257]     *See Wiwa*, 226 F.3d at 95-96. *See also In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278, 295 (S.D.N.Y. 2005) (seeking "direction and help" from the parent company creates a plausible inference of agency). *See generally Wiwa*, 2002 WL 319887, at *13 n.14 ("By involving themselves directly in [the subsidiary's] activities, and by directing these activities, [the parent companies] made [their subsidiary] their agent with respect to the torts alleged in the complaint."). *But see Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461-62 (2d Cir. 1995) ("The presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent.").

[258]     *Phelan v. Local 305 of the United Ass'n of Journeymen*, 973 F.2d 1050, 1062 (2d Cir. 1992). *Accord Doro v. Sheet Metal Workers Int'l Ass'n*, 498 F.3d 152, 156 (2d Cir. 2007) (recognizing that common law agency principles extend the right to sue a principal that ratifies the illegal act of an agent). *See generally Federal Elections Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1984) (recognizing the doctrine of ratification under common law agency principles).

[259]     *Hamm v. United States*, 483 U.S. 135, 140 (2d Cir. 2006) (quoting Restatement (Second) of Agency § 82 (1958)). *Accord Phelan*, 973 F.2d at 1062 ("Ratification occurs 'when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it.'" (quoting *Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967, 973 (2d Cir. 1987))).

"if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself."[260]  Even mere acquiescence is sufficient to infer adoption of wrongdoing.[261]  "Ratification also may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what had been done."[262]

## B.    Discussion

At the motion to dismiss stage, the question "is not whether plaintiffs have proved the existence of an agency relationship, merely whether they should have the chance to do so."[263]  Although *Twombly* certainly raised the bar concerning notice pleading, it did not eliminate Rule 8 or – more importantly – the Seventh Amendment.  For that reason, I will not consider extrinsic evidence on

---

[260]    *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936).

[261]    *See In re Bennett Funding Group*, 336 F.3d 94, 101 (2d Cir. 2003).

[262]    *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994).  *Accord Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1388 (9th Cir. 1987) (noting that attempting to conceal an agent's misdeeds rather than remedy them supports an inference of ratification).

[263]    *In re Parmalat Secs. Litig.*, 375 F. Supp. 2d at 295.  *Accord id.* at 294 (noting that a court may deny a motion to dismiss when "plaintiffs have made specific allegations from which an agency relationship could be inferred").

this issue in deciding the pending motion.[264]  On the other hand, "Purely

conclusory allegations cannot suffice to state a claim based on veil-piercing or

alter-ego liability."[265]

### 1.    Piercing the Corporate Veil

#### a.    The *Ntsebeza* Complaint

Beyond conclusory assertions, the *Ntsebeza* plaintiffs do not make

sufficient allegations to permit the case to proceed against any defendant on a veil-

piercing theory.  For example, even if – as plaintiffs allege – GM "simply

maintained its business through its subsidiary so that it could continue to benefit

from its participation in the crimes of the apartheid regime,"[266] that does not

undermine the legal distinction between GM and General Motors South Africa.

#### b.    The *Khulumani* Complaint

The *Khulumani* Complaint similarly fails to present allegations that

---

[264]    Plaintiffs have not had the opportunity to conduct discovery
concerning the relationships between defendants and their South African
subsidiaries; thus allowing the introduction of evidence outside of these
Complaints would convert this motion to a motion for summary judgment
pursuant to Federal Rule of Civil Procedure 56(f).  *See Sahu v. Union Carbide
Corp.*, 418 F. Supp. 2d 407, 415-16 (S.D.N.Y. 2005).

[265]    *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385,
426 (S.D.N.Y. 2003).

[266]    Pl. Mem. at 68.

would support piercing the corporate veil of any defendant. Although GM, for example, allegedly "used its foreign subsidiary, GM[ South Africa], to build the trucks and other vehicles that it sold to the South African security forces,"[267] this in no way differs from an ordinary relationship between a parent corporation and a local sales and manufacturing subsidiary. The *Khulumani* plaintiffs – like the *Ntsebeza* plaintiffs – failed to allege any of the ten factors ordinarily applied to an alter ego inquiry in more than a conclusory manner.

### 2. Corporate Agency

#### a. The *Ntsebeza* Complaint

The *Ntsebeza* plaintiffs have made substantial allegations to support liability against a number of defendants under an agency theory. GM allegedly carried out its activities in South African through GM South Africa (Pty) Ltd., which was separately incorporated.[268] Senior management in GM South Africa allegedly included American personnel, who had been sent from GM.[269] Moreover, although GM purportedly "sold" GM South Africa to South African investors headed by local management in 1987, GM allegedly sent a senior

---

[267]    *Khulumani* Complaint ¶ 278.

[268]    *See Ntsebeza* Complaint ¶ 84.

[269]    *See id.*

manager from Detroit to South Africa to run the "new" company.  Moreover, in

1997, GM allegedly executed a buy-back provision in the original sale agreement

and now allegedly once again owns GM South Africa.[270]  These specific

allegations make the broader claim of agency asserted by the *Ntsebeza* plaintiffs

plausible, on the theory either that GM South Africa carried out its activities on

behalf of GM or that GM ratified those activities in order to profit from them.

   Similarly, the allegations against Ford are sufficient to allow the case

against it to proceed on an agency theory.  From 1933 until 1985, Ford Motor

Company of South Africa (Pty) Ltd. was allegedly a wholly-owned subsidiary of

Ford Motor Company of Canada, itself a 76% owned subsidiary of Ford.[271]  More

importantly, Ford South Africa allegedly relied on American management and

used parts shipped from Ford Canada and Ford England, in order to sell Ford

vehicles without running afoul of U.S. trade restrictions.[272]  In 1985, Ford South

Africa underwent a merger resulting in the creation of South African Motor

Corporation (SAMCOR), which was 42% owned by Ford but allegedly continued

to produce Ford-branded products using Ford parts and relying on Ford managers

---

[270] *See id.* ¶ 100.

[271] *See id.* ¶ 101.

[272] *See id.* ¶¶ 101-102.

and engineers.[273] In 1987, Ford allegedly fully divested its ownership share in SAMCOR but neither repatriated the proceeds nor ceased its managerial relationship with the company.[274]   These specific allegations again lend sufficient plausibility to the broader allegation of a principal-agent relationship between Ford and Ford Motor Company of South Africa (Pty) Ltd. or SAMCOR.

Daimler allegedly began its activities in South Africa through a contract relationship with Car Distribution Assembly, then later through United Car and Diesel Distributors after United Car purchased Car Distribution Assembly.  In 1984, Daimler acquired a majority stake in United Car.  Most importantly, Daimler allegedly oversaw all operations at the plant producing Mercedes cars in South Africa, and management in Germany was aware of and directly involved in the activities material to the Complaint.[275]  At the motion to dismiss stage, these allegations are sufficiently plausible to allow this claim to proceed on a theory of vicarious liability.

Finally, IBM allegedly carried out the activities described previously

---

[273]    *See id.* ¶¶ 103, 128.

[274]    *See id.* ¶ 128.

[275]    *See id.* ¶ 55.

through a subsidiary, IBM South Africa.[276]  IBM allegedly supplied products,

parts, and expertise to the subsidiary, which then merely distributed these goods to

South African customers.[277]  Moreover, the *Ntsebeza* plaintiffs allege that IBM

engaged in a campaign to deliver products to South Africa in circumvention of

export controls implicitly involving U.S. management.[278] After IBM sold its

subsidiary to a group of local employees in 1987, IBM South Africa allegedly

continued to serve as a mere conduit for IBM products and parts for the unlawful

ends described above.[279]  In 1992, IBM allegedly executed a buy-back provision in

the 1987 divestment agreement in order to regain ownership of IBM South

Africa.[280]  These specific allegations are sufficient to support the broader

allegation of vicarious liability.

   Although the *Ntsebeza* plaintiffs cannot proceed on an alter ego

theory, the claims against GM, Ford, Daimler, and IBM may proceed on a theory

of agency liability.

---

[276] *See id.* ¶ 129.

[277] *See id.* ¶¶ 129-130, 140.

[278] *See id.* ¶ 140.

[279] *See id.* ¶ 141.

[280] *See id.*

### b.     The *Khulumani* Complaint

Unlike the *Ntsebeza* plaintiffs, the *Khulumani* plaintiffs have failed to provide specific allegations to buttress their broader claim of principal-agent relationships between each corporate defendant and the South African actors who carried out the acts detailed above.  For example, the *Khulumani* plaintiffs allege that IBM and GM sold products to their former subsidiaries after divestment, allowing the former subsidiaries to continue to sell those products.[281]  Absent assertions of a relationship between management of the parent company and its South African subsidiary, the allegations of agency liability are conclusory and do not meet the *Twombly* standard of plausibility.

However, the *Khulumani* plaintiffs have expressly requested leave to amend their Complaint in order to substantiate their alter ego and vicarious liability claims.[282]  Given the success of the *Ntsebeza* plaintiffs in pleading an agency relationship between some defendants and their subsidiaries, the *Khulumani* plaintiffs may file an amended complaint supplementing their allegations with regard to relationships between defendants and their alleged

---

[281]     *See id.* ¶ 244; *id.* ¶ 286 (GM).

[282]     *See* Pl. Mem. at 67 n.77.

agents.[283]

## IX.   PRUDENTIAL DOCTRINES

The final ground on which defendants seek the dismissal of these

actions are the prudential doctrines of comity and political question.[284]  However,

for the reasons discussed below, the limited actions that have survived this Court's

analysis of defendants' other challenges need not be dismissed on these grounds.

### A.   Factual Background

The South African Government and the Executive Branch of the

United States have expressed their support for dismissal of these actions in formal

statements of interest and various other pronouncements, including  amicus briefs,

resolutions, press releases, and even floor statements in the South African

Parliament.  The Governments of Germany, Switzerland, Canada and Britain have

expressed similar views that these actions should be dismissed against their

corporate domiciliaries.[285]

---

[283]    Again, if the allegations in the amended *Khulumani* Complaint are
similar to those made in the *Ntsebeza* Complaint, the outcome of any motion to
dismiss will be the same.  The exception of course concerns Fujitsu, who is not a
defendant in the *Ntsebeza* case.

[284]    *See* Def. Mem. at 29-38.

[285]    Notably, no claims remain in these actions against Swiss, Canadian,
or British defendants.

By contrast, Desmond Tutu – Chairman of the Truth and

Reconciliation Commission of South Africa ("TRC") and Nobel laureate – and

other TRC Commissioners submitted an amicus brief urging the Second Circuit to

reinstate these actions.  Archbishop Tutu had previously submitted  two letters to

the District Court opposing dismissal.  Finally, Joseph Stiglitz, Nobel laureate and

former Chief Economist of the World Bank, filed a letter with this Court rejecting

the economic analysis relied upon by the United States and South African

Governments in their Statements of Interest.  I will discuss the most important of

these statements in turn.

### 1.    United States Government Statements

On October 30, 2003, the Legal Advisor of the United States

Department of State advised this Court "that continued adjudication of the

above-referenced matters risks potentially serious adverse consequences for

significant interests of the United States."[286]  After outlining the objections of the

Republic of South Africa, the Legal Advisor observed that the Republic of South

Africa "is broadly representative of the victims of the apartheid regime" and "is

---

[286]    10/30/03 Statement of Interest of the United States ("U.S. Statement
of Interest") at 1, *reproduced at* 2 Defendants' Appendix of Declarations and
Cited Materials ("Def. App.") 685.

uniquely charged with a popular mandate to deal with the legacy of apartheid."[287]

Further, the Legal Advisor noted South Africa's concern that this litigation might

hamper foreign investment in South Africa.[288]  The Legal Advisor concluded,

> [W]e can reasonably anticipate that adjudication of these
> cases will be an irritant in U.S.-South African relations. *To
> the extent that adjudication impedes South Africa's
> on-going efforts at reconciliation and equitable economic
> growth*, this litigation will also be detrimental to U.S.
> foreign policy interests in promoting sustained economic
> growth in South Africa.[289]

In addition, the Legal Advisor expressed concern over the chilling effect that suits

of this kind may have on future foreign investment in developing countries, which

is an important component of the United States foreign policy of constructive

engagement.[290]  The Legal Advisor concluded,

---

[287]    *Id.*

[288]    *See id.* at 1-2.

[289]    *Id.* at 2 (emphasis added).  Similarly, in light of the "profound
concern" expressed by other nations, "including Canada and Great Britain, . . . that
their banks, corporations and other entities have been named as defendants," the
State Department "anticipat[ed] *possible*, continuing tensions in our relations with
these countries over the litigation." *Id.* (emphasis added).  The Legal Advisor also
noted these nations' "strong belief that the issues raised in the litigation are most
appropriately handled through South Africa's domestic processes." *Id.*

[290]    *See id.* ("[T]he prospect of costly litigation and potential liability in
U.S. courts *for operating* in a country whose government implements oppressive
policies will discourage the U.S. (and other foreign) corporations from investing in
many areas of the developing world, where investment is most needed and can

> *To the extent that the apartheid litigation in U.S. courts*
> *deters such investment*, it will compromise a valuable
> foreign policy tool and adversely affect U.S. economic
> interests as well as economic development in poor
> countries.[291]

Finally, in all of its submissions, the United States implicitly and explicitly

characterized plaintiffs' claims – as well as the basic application of aiding and

abetting liability under ATCA – as seeking liability simply for doing business in

South Africa.[292]

## 2. South African Government Statements

On April 15, 2003, in response to the final report of the TRC, the

President of the Republic of South Africa, Thabo Mbeki, made a public

announcement of the programs that would be implemented to assist the victims of

---

have the most forceful and positive impact on both economic and political
conditions." (emphasis added)).

[291] *Id.* at 2-3 (emphasis added).

[292] *See* Brief of the United States as Amicus Curiae in Support of
Petitioners at 1, *reproduced at* 2 Def. App. 688 ("[Plaintiffs] contend that, *by
conducting business in South Africa*, petitioners aided and abetted violations of
international law." (emphasis added)). *See also id.* at 21 (outlining policy
implications if tort liability existed against companies that "invest or operate" in
countries "with regimes whose policies the United States would like to
influence"); U.S. Statement of Interest at 4 (objecting to litigation penalizing
corporations "for operating in a country whose government implements oppressive
policies").

apartheid, including a one-time grant of 30,000 Rand (approximately $3,500) to

individuals designated by the TRC.[293]  President Mbeki then addressed the issue of

"civil suits against corporations that benefitted from the apartheid system."[294]

Although he reiterated that "there shall be no general amnesty . . . [because] any

such approach would fly in the face of the TRC process" and recognized "the right

of citizens to institute legal action" and "the possibility for individual citizens to

take up any grievance related to human rights violations with the courts,"[295]

President Mbeki stated,

> [W]e consider it completely unacceptable that matters that
> are central to the future of our country should be
> adjudicated in foreign courts which bear no responsibility
> for the well-being of our country and the observance of the
> perspective contained in our Constitution of the promotion
> of national reconciliation.[296]

---

[293]   *See* 4/15/03 Statement of Thabo Mbeki ("Mbeki Statement"),
*reproduced at* 1 Def. App. 396.

[294]   Mbeki Statement at 8.

[295]   *Id.* at 7-8.

[296]   *Id.* at 8.  *Accord* Brief of *Amicus Curiae* Republic of South Africa in
Support of Affirmance, at 2, *reproduced at* 2 Def. App. 645 ("[T]hese litigations
interfere with [South Africa's] independence and sovereignty, including its
sovereign right to determine, according to its internal political and constitutional
order, how best to address apartheid's legacy.").  On April 16, 2003, the Cabinet
of the Republic of South Africa resolved, "It remains the right of the government
to define and finalise issues of reparations, both nationally and internationally."
7/23/03 Declaration of Penuell Mpapa Maduna, Minister of Justice, Republic of

Similarly, President Mbeki rejected the "once-off wealth tax on corporations proposed by the TRC," emphasizing that the Government's approach is informed by "the desire to involve all South Africans, including corporate citizens, in a co-operative and voluntary partnership to reconstruct and develop South African society."[297]

Against this backdrop, South African Minister of Justice Penuell Mpapa Maduna filed a declaration stating that this "litigation appears to suggest that the government . . . has done little or nothing about redressing the ravages of the apartheid system."[298]  Further, Minister Maduna expressed concerns that this litigation would discourage foreign direct investment in South Africa.[299]  Finally, Minister of Justice Maduna directly invoked international comity, insisting that this Court should "abstain from adjudicating" this case to avoid "interfer[ing] with [a] foreign sovereign's efforts to address matters in which it has the predominant

---

South Africa ("Maduna Decl.") ¶ 7 *reproduced at* 2 Def. App. 627.  However, this statement addressed a suit – now dismissed – against two South African mining companies. *See id.*  No South African defendants remain in these actions.

[297]    Mbeki Statement at 8.

[298]    Maduna Decl. ¶ 3.3

[299]    *See id.* ¶ 12.

interest.[300]

In response to the Second Circuit's decision in *Khulumani*, President Mbeki reiterated the South African Government's opposition to these suits. Although he noted that "what reparations were disbursed consequent to the recommendations of the TRC[] could only be symbolic as they could never comprehensively and adequately recompense any single person" and again underscored "the right of individuals or communities to pursue their *specific* grievances through the courts, within and outside South Africa,"[301] he reiterated that "these matters should properly be addressed within South Africa's political and legal processes."[302]

### 3.    Statements by TRC Commissioners

In stark contrast, Chairman Tutu and Commissioners of the TRC submitted an amicus brief to the Second Circuit stating, "There was absolutely nothing in the TRC process, its goals, or the pursuit of the overarching goal of reconciliation, linked with truth, that would be impeded by this litigation. To the

---

[300]    *Id.* ¶ 13.

[301]    Hansard Debates of the National Assembly, Nov. 8, 2007, at 25-26 (S. Afr.) (Statement of President Mbeki), *reprinted at* 2 Def. App. 666 (emphasis added).

[302]    *Id.* at 25.

contrary, such litigation is entirely consistent with these policies and with the

findings of the TRC."[303]  The Promotion of National Unity and Reconciliation Act

("TRC Act") created the TRC and charged it with investigating and documenting

human rights violations committed under apartheid between March 1960 and May

1994.[304]  The Act created a specific Amnesty Committee, which was given the

power to grant civil and criminal amnesty to "persons who ma[de] full disclosure

of all the relevant facts relating to acts associated with a political objective"

committed in the course of conflicts related to apartheid.[305]  The Amnesty

Commission adjudicated each application for amnesty, and each grant of amnesty

both obliged the Government to pay reparations to victims and precluded victims

from seeking redress from those who received amnesty.

> The TRC never contemplated that victims would be
> precluded from seeking compensatory damages from those
> liable for abuses, *unless* the TRC had granted that
> perpetrator amnesty.  To the contrary, the Commission
> recognized that victims and their families have a right to
> institute civil proceedings unless the defendant applied for

---

[303]    TRC Br. at 8 (emphasis added).

[304]    *See* Act 34 of 1995 (S. Afr.), *reproduced at* Pl. App. 1.

[305]    TRC Act preamble.  *Accord* TRC Act § 20; 6 *Final Report of the
Truth and Reconciliation Commission* 84 (2003), *available at*
http://www.doj.gov.za/trc/report/.

and was granted amnesty.[306]

Because the TRC Act afforded amnesty only to "persons,"

corporations likely were not qualified to receive amnesty by the terms of the Act

and none sought to obtain amnesty. However, the TRC instituted a separate

hearing on the business sector. The TRC concluded that "business involvement in

gross violations of human rights during the apartheid era fell within a broad range

of complicity,"[307] including "direct involvement in shaping government policies or

engaging in activities directly associated with repressive functions."[308] The TRC

was not able to determine the full scope of corporate responsibility because it "was

hampered by business's lack of active and forthcoming participation."[309]

Although some South African corporations offered meager

cooperation, defendants in this litigation "did not appear at TRC hearings, and

---

[306]    TRC Br. at 8.

[307]    *Id.* at 9.

[308]    6 *Final Report of the Truth and Reconciliation Commission* 140.
*Accord Institutional Hearing: Business and Labor* ¶¶ 26-30, *in* 4 *Final Report of
the Truth and Reconciliation Commission* (2003), *reproduced at* Pl. App. 179
(describing "second order involvement" in human rights abuses as businesses
knowing their products or services would be used for or contribute to repression
and citing as an example the provision of armored vehicles to the police); *id.* ¶ 75
(finding that some businesses willingly manufactured products they "knew would
be used to facilitate human rights abuses").

[309]    TRC Br. at 11.

they have not acknowledged any complicity with the gross human rights violations

of the South African government."[310]

> The Commissioners' brief concluded:

>> The truth about apartheid – about its causes and effects . . .
>> about who was responsible for its maintenance – continue
>> to emerge.     This litigation is one element of that
>> emergence; it is not crude "victors' justice." It is just
>> "justice." It is frankly puzzling why determining through
>> this litigation the accountability under international law of
>> defendants – who did not participate in the TRC process,
>> and who simply deny liability – could even arguably be
>> foreclosed by the TRC, its processes, or the policies
>> embodied within it.[311]

Although corporations were probably not qualified to seek amnesty, nothing in the

TRC Act amounted to an implicit grant of amnesty to multinational corporations.

The initial TRC Report recognized that corporations could be held *criminally*

liable for crimes against humanity,[312] and the final TRC Report recognized that

corporations could be held civilly liable.[313] Further, because corporate

organizations were *expressly* provided amnesty for vicarious liability in cases

---

[310]     *Id.* at 12-13.

[311]     *Id.* at 14.

[312]     *See The Mandate* appx. 1, ¶ 26, *in* 1 *Final Report of the Truth and Reconciliation Commission* (1998) (noting that "organizations or groups outside government are capable of committing crimes").

[313]     *See* TRC Br. at 7.

where their agents had received amnesty and where the agent had died, the TRC

Act *implicitly* recognized that corporations could be held civilly liable in other

circumstances.[314]  Indeed, because most businesses had neither sought nor

received amnesty – and because most businesses decided not to participate in the

TRC business hearings – the TRC final report recommended that business "must

be held accountable" outside the TRC process.[315]

### B.      Applicable Law

#### 1.      Case-Specific Deference

There are two ways in which prudential considerations may be

addressed when a federal court is called upon to exercise its ATCA jurisdiction.

*First*, as discussed above, recognition of a tort in violation of customary

international law involves "'an element of judgment about the practical

consequences of making that cause available to litigants.'"[316]  *Second*, the

Supreme Court noted in *Sosa* that "in certain cases, other prudential principles

---

[314]      *See* TRC Act § 20(7)(a), (c) (describing the elimination of liability for
a "body" or "organization").  *See also* TRC Br. at 8 ("The ability of the TRC to
grant amnesty to qualifying applicants belies the notion that some policy
embodied in the TRC amounted to an implicit grant of amnesty to multinational
corporations.").

[315]      *Institutional Hearing: Business and Labor* ¶ 161.

[316]      *Khulumani*, 504 F.3d at 261 (quoting *Sosa*, 542 U.S. at 732-33).

might operate to 'limit[] the availability of relief in the federal courts for violations of customary international law.'"[317]

In the latter category, *Sosa* – in specific reference to *these* cases – noted that certain cases might require "a policy of case-specific deference to the political branches."[318]  In cases where both a foreign government and the United States argue that allowing an ATCA case to proceed would interfere with domestic policies of a foreign nation, the Court suggested "that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."[319] In the instant case, "[t]he parties agree that *Sosa*'s  reference to 'case-specific deference' implicates either the political question or international comity doctrine."[320]

Before reaching the intricacies of the political question and international comity doctrines, three comments are in order regarding *Sosa*'s

---

[317]    *Id.* (quoting *Sosa*, 542 U.S. at 732 n.21).

[318]    *Sosa*, 542 U.S. at 732 n.21.

[319]    *Id.* (citations omitted).

[320]    *Khulumani*, 504 F.3d at 262 n.10. Although *Sosa* additionally raised exhaustion as a possible prudential limitation, *see* 542 U.S. at 732 n.21, defendants have not claimed an exhaustion defense. Because exhaustion in the ATCA context is an affirmative defense,  *see Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc) (plurality opinion), this defense is waived.

footnote 21.[321]  *First*, footnote 21 merely provides guidance concerning the need

for deference with regard to foreign policy matters; it does not mandate summary

dismissal of this case.[322]  *Second*, the Executive Branch is not owed deference on

every topic; rather this Court will give serious consideration to the Executive's

views only with regard to the case's "impact on foreign policy."[323]  *Third*,

deference does not mean delegation; the views of the Executive Branch – even

---

[321]     The portion of that footnote relating to this case reads as follows:
"[T]here are now pending in Federal District Court several class actions seeking
damages from various corporations alleged to have participated in, or abetted, the
regime of apartheid that formerly controlled South Africa.  The Government of
South Africa has said that these cases interfere with the policy embodied by its
Truth and Reconciliation Commission, which 'deliberately avoided a 'victors'
justice' approach to the crimes of apartheid and chose instead one based on
confession and absolution, informed by the principles of reconciliation,
reconstruction, reparation and goodwill.'  The United States has agreed.  In such
cases, there is a strong argument that federal courts should give serious weight to
the Executive Branch's view of the case's impact on foreign policy."  *Sosa*, 542
U.S. at 732 n.21 (internal citations omitted).

[322]     *See Khulumani*, 504 F.3d at 261 n.9 (quoting *Sosa*, 542 U.S. at 733
n.21).

[323]     *Id.*  The Executive Branch's interpretations of the applicable law and
the allegations made in the Complaint "'merit no special deference,'" as they are
pure questions of law that are "'well within the province of the Judiciary.'"  *City
of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365,
376, n.17 (2d Cir. 2006) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677,
701 (2004)).

where deference is due – are but one factor to consider and are not dispositive.[324]

## 2.   Political Question Doctrine

A "case-by-case" inquiry under the political question doctrine

requires application of "'six independent tests' identified by the Supreme Court in

*Baker v. Carr*:

> [1] a textually demonstrable constitutional commitment of
> the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable
> standards for resolving it; or
> [3] the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion;
> or
> [4] the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due
> coordinate branches of government; or
> [5] an unusual need for unquestioning adherence to a
> political decision already made; or
> [6] the potentiality of embarrassment from multifarious
> pronouncements by various departments on one
> question.[325]

---

[324]    *See Khulumani*, 504 F.3d at 263-64 & n.13.   In *Republic of Austria v. Altmann*, the only case cited in footnote 21, the Supreme Court was similarly hesitant to define the level of deference due to the State Department concerning the application of exemptions to the Foreign Sovereign Immunities Act ("FSIA"). *See* 541 U.S. at 702 (noting that such opinions "might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"). *See also id.* at 702 n.23 (holding that an executive interpretation cannot "trump considered application of the FSIA's more neutral principles").

[325]    369 U.S. 186, 217 (1962). *Accord Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 70 (2d Cir. 2005) (noting the continued use of these factors).

Satisfaction of any of any of these tests may support dismissal.[326]

The first three *Baker* factors will almost never apply in ATCA suits, which are committed to the judiciary by statute and utilize standards set by universally recognized norms of customary international law.[327]  Further, the "fourth through sixth Baker factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests."[328]

"[I]n applying the fourth *Baker* test, courts have been particularly attentive to the views of the United States Government about the consequences of

---

"Not only does resolution of [foreign relations] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand a single-voiced statement of the Government's views." *Baker*, 369 U.S. at 217.

[326]    *See Whiteman*, 431 F.3d at 72.

[327]    *See Kadic*, 70 F.3d at 249.

[328]    *Id.  Accord Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) (noting that "[t]hese tests are probably listed in descending order of both importance and certainty").  In one prominent example, the Second Circuit dismissed Holocaust-related property claims because the Executive Branch had properly entered into an executive agreement with Austria that – by its express terms – could not take effect unless and until the litigation was dismissed. *See Whiteman*, 431 F.3d at 72-73.

101

proceeding with litigation."[329]  Nevertheless, "not every case 'touching foreign

relations' is nonjusticiable and judges should not reflexively invoke these

doctrines to avoid difficult and somewhat sensitive decisions in the context of

human rights."[330]  Accordingly, even in circumstances where deference is due, the

Executive Branch's views will not prevail if they are "presented in a largely vague

and speculative manner" or if the Executive's concerns are not "severe enough or

raised with the level of specificity required to justify . . . a dismissal on foreign

policy grounds."[331]

### 3.    International Comity

International comity is "the recognition which one nation allows

within its territory to the legislative, executive or judicial acts of another nation,

having due regard both to international duty and convenience, and to the rights of

---

[329]     *Whiteman*, 431 F.3d at 72 n.17 (citing *Kadic*, 70 F.3d at 250).
*Accord Alperin v. Vatican Bank*, 410 F.3d 532, 556-57 (9th Cir. 2005) (noting "the
Executive Branch's continuing silence on the Holocaust Survivors' claims" but
stating that "[h]ad the State Department expressed a view, that fact would certainly
weigh in evaluating this fourth *Baker* formulation").

[330]     *Kadic*, 70 F.3d at 249.  *Accord Whiteman*, 431 F.3d at 69 ("'[I]t is
error to suppose that every case or controversy which touches foreign relations lies
beyond judicial cognizance.'" (quoting *Baker*, 369 U.S. at 211)); *Klinghoffer v.
S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 49 (2d Cir. 1991) ("'[T]he
doctrine is one of political questions, not one of political cases.").

[331]     *Permanent Mission of India*, 446 F.3d at 376 n.17.

its own citizens or of other persons who are under the protection of its laws."[332]

"The doctrine is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency."[333]

"The doctrine has never been well-defined,"[334] and two distinct doctrines are often conflated under the heading "international comity."[335] Here the issue is comity among courts, "a discretionary deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state."[336] "When a court dismisses on the ground of comity, it should ordinarily consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction against it in the foreign forum."[337]

---

[332]   *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

[333]   *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005). *Accord Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971) (same).

[334]   *JP Morgan Chase Bank*, 412 F.3d at 423.

[335]   *In re Maxwell Comm. Corp.*, 93 F.3d 1036, 1047 (2d Cir. 1996).

[336]   *Id.* International comity is also used to describe "a canon of [statutory] construction" that may "shorten the reach of a [domestic] statute." *Id.* This application of international comity is not at issue here.

[337]   *Jota*, 157 F.3d at 160.

103

However, "extreme cases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum."[338]

"International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction."[339] There is no conflict for comity purposes "'where a person subject to regulation by two states can comply with the laws of both.'"[340] If there is a true conflict, the decision whether to dismiss on comity grounds depends on the degree of legitimate offense to the foreign sovereign,[341] steps the foreign sovereign may have taken to address the issues in the litigation, and the extent of the United States' interest in the

---

[338]   *Id.*

[339]   *In re Maxwell Comm. Corp.*, 93 F.3d at 1049-50. *Accord Chavez v. Carranza*, ___ F.3d ___, No. 06-cv-6234, 2009 WL 670022, at *5 (6th Cir. Mar. 17, 2009) ("In order for an issue of comity to arise, there must be an actual conflict between the domestic and foreign law."); *In re Grand Jury Proceedings*, 40 F.3d 959, 964 (9th Cir. 1994) ("A party relying on foreign law to contend that a district court's order violates principles of international comity bears the burden of demonstrating that the foreign law bars compliance with the order.").

[340]   *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 403 cmt. e).

[341]   *See Jota*, 157 F.3d at 160.

underlying issues.[342]

### C.   Discussion

#### 1.   Political Question

As the Second Circuit recognized in *Kadic v. Karadžić*, the first three

*Baker* factors do not apply to ATCA suits applying "universally recognized norms

of international law."[343]   Moreover, allowing these suits to continue would not

contradict American foreign policy in a manner that would "seriously interfere

with important governmental interests."[344]   Therefore, the fourth through sixth

*Baker* factors are similarly inapplicable to this case.

Defendants argue that "plaintiffs' claims call upon the judiciary to

second-guess decisions made by the political branches *to permit and encourage*

*commerce* with apartheid-era South Africa."[345]   But this argument addresses

different Complaints than those that the Court is now considering.   The claims

described above do not challenge the political branches' policy of constructive

---

[342]   *See Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582, 585-
86 (2d Cir. 1993). *See generally* Restatement (Third) of the Foreign Relations
Law of the United States § 403(2)-(3) (elaborating factors relevant in cases of
conflict).

[343]   70 F.3d at 249.

[344]   *Id.*

[345]   Def. Reply at 17.

engagement with apartheid-era South Africa or aim "to hold defendants liable for engaging in commerce consistent with those policies."[346]   Rather, to survive this motion to dismiss, plaintiffs must plausibly allege that defendants "substantially assisted" violations of the law of nations and knew that their assistance would be substantial.  Merely engaging in commerce is insufficient.  Thus it is a *non-sequitur* to argue that a suit alleging that a defendant wrongfully engaged in commerce would implicate the political question doctrine.  Because the United States' Statement of Interest relies on the identical, erroneous premise, considerably less deference is owed to its ultimate conclusions.[347]  To the extent the Executive Branch suggests that a prohibition on knowingly providing substantial assistance to violations of the law of nations would have a substantial chilling effect on doing lawful business in a pariah state, the suggestion is speculative at best.  Moreover, the assertion in the Statement of Interest that this litigation "will compromise a valuable foreign policy tool" is true only "[t]o the

---

[346]     *Id.* at 17-18.

[347]     *See* U.S. Statement of Interest at 2 ("[T]he prospect of costly litigation and potential liability in U.S. courts for *operating* in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world."). The Executive Branch is not owed deference on its interpretation of plaintiffs' claims.

extent that the apartheid litigation in U.S. courts deters such investment."[348]  The

Statement of Interest never states that this litigation *will* necessarily deter such

investment, and there is no reason to believe based on the pleadings that these

cases – viewed in light of the applicable law – will have such an effect.[349]

Nor would a determination that defendants aided and abetted the

crimes of the apartheid regime lead to "'embarrassment from multifarious

pronouncements by various departments on one question.'"[350] At no point did the

political branches instruct or authorize defendants' alleged conduct.[351]  The

---

[348]   *Id.*

[349]   The Executive Branch raised an additional concern that "adjudication
of these cases will be an irritant in U.S.-South African relations" both because of
potential interference with South Africa's sovereign right to decide apartheid
issues and because of potential discouragement of investment.  U.S. Statement of
Interest at 2.  A speculative conflict with the goal of maintaining good relations
with a foreign nation – as opposed to a conflict with the authority of the political
branches – is not the type of conflict that normally triggers dismissal under the
political question doctrine.  *Cf. Whiteman*, 431 F.3d at 72-73 (interference with
implementation of an executive agreement); *Corrie v. Caterpillar, Inc.*, 503 F.3d
974 (9th Cir. 2007) (adjudication of whether sales financed by the United States
violated customary international law).  This issue is addressed below with regard
to international comity.

[350]   Def. Reply at 18 (quoting *Baker*, 369 U.S. at 217).

[351]   In fact, as the nature of assistance provided by American companies
to specific acts of apartheid became clear, the political branches enacted specific
prohibitions on such commerce.  *See, e.g.*, Executive Order 12,532, 50 F.R. 36861
(Sept. 9, 1985) (barring the export of computers and information technology to
"[a]ny apartheid enforcing agency" of the South African Government).

distinction between this case and the Ninth Circuit's decision in *Corrie v.*

*Caterpillar, Inc.* is illustrative. In *Corrie*, plaintiffs brought suit against

Caterpillar for selling bulldozers to the Israeli Defense Forces ("IDF"), under a

theory of aiding and abetting extrajudicial killing. The Ninth Circuit dismissed the

action under the political question doctrine because the United States Government

paid for the bulldozers, and finding Caterpillar liable for the sales would

"necessarily require the judicial branch of our government to question the political

branches' decision to grant extensive military aid to Israel."[352] In contrast,

resolution of this case neither requires this Court to pass judgment on the policy of

constructive engagement or the United States' relationship with apartheid-era

South Africa.[353]

### 2.    Comity

---

[352]    503 F.3d at 982.

[353]    The absence of conflict distinguishes these cases from *Whiteman v. Dorotheum*, where the Second Circuit dismissed an action under the political question doctrine because "the United States Government established through an executive agreement an alternative international forum for considering the claims in question" and "the United States foreign policy advanced by the executive agreement [wa]s substantially undermined by the continuing pendency of th[at] case." 431 F.3d at 72-73. No foreign policy initiative – or formal executive agreement – would be "substantially undermined" by the continuing pendency of this case. Further, the United States has not attempted to establish an alternative forum for consideration of these claims.

The absence of conflict between this litigation and the TRC process is fatal to the argument that international comity requires dismissal. The TRC process was not exclusive – by its terms, only upon a grant of amnesty was the right of "victims and/or their families to institute criminal and/or civil proceedings . . . extinguished."[354] Former President Mbeki and the TRC Report both acknowledged that a victim may sue those who declined to offer testimony to the TRC.[355] Defendants did not appear before the TRC. Plaintiffs have now come to this Court to exercise their rights.

Defendants do not argue – and South Africa has not claimed – that "an adequate forum exists in the objecting nation" to hear these suits or that defendants are "subject to or ha[ve] consented to the assertion of jurisdiction against it in the foreign forum."[356] Nor does this litigation conflict with the *goals*

---

[354]     6 *Final Report of the Truth and Reconciliation Commission* 100. *Accord* TRC Act § 20(7).

[355]     *See, e.g.*, Mbeki Statement at 7-8. *Accord Chavez*, 2009 WL 670022, at *5 (finding no true conflict where an amnesty provision barred domestic suits but not suits abroad). Thus these cases stand in stark contrast to *Bi v. Union Carbide Chemicals & Plastics Co.*, in which the claims of victims of an environmental disaster were dismissed in light of an Indian law that had granted the Indian Government exclusive authority to bring the claims and the Indian Government exercised that right to settle all claims in an Indian forum. *See* 984 F.2d at 583.

[356]     *Jota*, 157 F.3d at 160.

of the TRC process; thus it is not an "extreme case" requiring dismissal even without the existence of an alternative forum for the plaintiffs' claims.[357] Defendants declined to participate in the TRC process and were not granted amnesty. As a result, the purposes of the TRC and this lawsuit are closely aligned: both aim to uncover the truth about past crimes and to confront their perpetrators. Although plaintiffs seek compensation for injuries resulting from defendants' alleged conduct, the TRC process provided immunity against suit only to those who testified voluntarily.[358] Further, it cannot be argued that South Africa instituted a policy of blanket immunity for corporations, given that the TRC Act implicitly recognized the possibility of corporate liability, the TRC Reports called for corporate liability outside the TRC process, and no one has asserted that South Africa sought to preclude corporate liability. Therefore international comity does

---

[357]   *Id.*

[358]   Defendants argue that the real issue is not whether defendants were granted amnesty but "whether a federal court should interfere with South Africa's stated preference that its democratically elected government provide the *exclusive mechanisms* to address harms inflicted by the apartheid-era South African government on South African citizens in South Africa." Reply Br. at 23 (emphasis added). It is not clear to what "exclusive mechanisms" defendants are referring. The TRC process was explicitly *not* exclusive and defendants have pointed to no other South African forum that has, can, or will adjudicate these claims.

not require dismissal of this suit.[359]

### D. Re-Soliciting Governmental Views

In light of this Court's determination that the political question

doctrine and international comity do not require dismissal, there is no need to re-

solicit the views of the Executive Branch and the Government of South Africa.

### X. STATUTE OF LIMITATIONS

As an alternative argument for dismissal, defendants assert that these

actions are barred by the applicable statute of limitations.[360] The Complaints do

not allege any wrongful conduct by the defendants after 1991, and most

allegations relate to conduct in the 1970s and 1980s. The Complaints were

originally filed in 2002. In light of the applicable ten-year statute of limitations,

discussed below, the actions are not timely absent some form of tolling. Under

equitable tolling, as well as *American Pipe* tolling and the doctrine of relation

---

[359] Although both the American and South African Governments assert that the potential of this lawsuit to deter future investment in South Africa mandates dismissal, this concern is not addressed by the doctrine of international comity. Moreover – even granting deference to their views – I am persuaded by the forceful rejection of this economic argument by Nobel Prize-winning economist Joseph Stiglitz. *See* 8/6/03 Letter from Joseph E. Stiglitz to the Court, *reproduced at* Pl. App. 281 (arguing that suits seeking to hold foreign companies accountable for their unlawful collaboration with a *prior regime* will not discourage foreign investors from investing in that country in the future).

[360] *See* Def. Mem. at 42-47.

back, these cases are not barred on statute of limitations grounds.

> The *Ntsebeza* Complaint sets forth two bases for tolling:
>
>> Equitable tolling applies . . . because there was no practical, or safe or effective way for Plaintiffs to bring these claims without risk of retaliation by the apartheid state prior to 1994. In addition, Defendants refusal to cooperate with the TRC and provide full accounting of their connection to the violations alleged in this complaint tolls the running of the statute of limitations with respect to plaintiffs' claims.[361]

With regard to the impracticality of gathering evidence prior to 1993 due to threats

of retaliation, the *Khulumani* Complaint alleges that:

>> Between 1990 and 1993, over 12,000 civilians were killed and at least 20,000 injured by the security forces of apartheid South Africa. . . . The numbers of assassinations of anti-apartheid leaders also increased from 28 in 1990, to 60 in 1991 and 97 in 1993.[362]

Although a formal agreement for non-racial elections was made in 1993, the

apartheid regime did not officially end until 1994 with the election of Nelson

Mandela in the first universal suffrage general election in South African history.[363]

> The TRC held hearings between 1996 and early 2002 and issued its

---

[361]   *Ntsebeza* Complaint ¶ 39.

[362]   *Khulumani* Complaint ¶ 84.

[363]   *See id.* ¶¶ 84-85.

final report in March 2003.[364]  As part of this process, hearings were held on the

role of businesses in the apartheid regime.  In the final report on the business

hearings, the TRC lamented "the failure of multinational corporations to make

submissions at the hearing," which "was greatly regretted in view of their

prominent role in South Africa's economic development under apartheid."[365]

According to a submission filed in this case by the TRC Commissioners, these

defendants "did not even respond to [the TRC's] invitation to participate in the

business hearings."[366]  As a result, the TRC was unable to detail the scope and

nature of defendants' involvement in advancing apartheid.

### A.    Applicable Law

#### 1.    Equitable Tolling

Statute of limitations defenses are affirmative defenses, which

normally cannot be decided on a motion to dismiss.  However, "an exception is

made where the complaint *facially* shows noncompliance with the limitations

---

[364]    *See Ntsebeza* Complaint ¶ 87.

[365]    *Institutional Hearing: Business and Labor* ¶ 161.  *Accord Khulumani*
Complaint ¶ 89 ("'Business failed in the hearings to take responsibility for its
involvement in state security initiatives specifically designed to sustain apartheid
rule.'" (quoting *Institutional Hearing: Business and Labor* ¶ 166)).

[366]    TRC Br. at 12.

period and the affirmative defense clearly appears on the face of the pleading."[367]

Similarly, when plaintiffs raise an equitable tolling argument, a court must deny a

motion to dismiss based on the statute of limitations "unless 'all assertions of the

complaint, as read with required liberality, would not permit the plaintiffs to prove

that this statute was tolled.'"[368]

"The basic question to be answered in determining whether, under a

given set of facts, a statute of limitations is to be tolled, is one of legislative intent

whether the right shall be enforceable . . . after the prescribed time."[369]  The

---

[367]     *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.
1 (3d Cir. 1994) (emphasis added). *Accord Trevino v. Union Pacific R.R.*, 916
F.2d 1230 (7th Cir. 1990); 5B Charles Alan Wright & Arthur R. Miller, *Federal
Practice & Procedure* § 1357 (3d ed. 2004).

[368]     *Mirman v. Berk & Michaels, P.C.*, No. 91 Civ. 8606, 1992 WL
332238 (S.D.N.Y. Oct. 30, 1992) (quoting *Joblon v. Dean Witter & Co.*, 614 F.2d
677, 682 (9th Cir. 1980)).  In light of *Twombly*, it is arguable that this rule should
be altered to state that a court must deny a statute of limitations defense on a
motion to dismiss unless all assertions in the complaint, read with the required
liberality, fail to make it *plausible* that the limitations period should be tolled.
However, this assumes that equitable tolling must be pleaded in the same manner
as an affirmative element of a claim.  That assumption cannot be correct given that
the statute of limitations defense remains an affirmative *defense*, which plaintiffs
are not, by definition, required to defeat in the pleadings.  Thus, the better view is
that the *Joblon* formulation is still correct.  Nor is the issue squarely presented in
this case, as the result would be the same under either standard.

[369]     *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 426 (1965)
(quotation marks omitted) (alteration in original).

114

relevant "legislative intent" is gleaned from "the purposes and policies underlying

the limitation provision, the Act itself, and the remedial scheme developed for the

enforcement of the rights given by the Act."[370] If the Act so permits,

> When determining whether equitable tolling is applicable,
> a district court must consider whether the person seeking
> application of the equitable tolling doctrine (1) has acted
> with reasonable diligence during the time period she seeks
> to have tolled, and (2) has proved that the circumstances
> are so extraordinary that the doctrine should apply.[371]

The ATCA does not contain a statute of limitations. However, the

TVPA – which is appended as a statutory note to the ATCA – provides the

applicable limitations period of ten years for ATCA claims.[372] In light of the

TVPA's explicit purpose to "protect[] . . . human rights,"[373] and "because regimes

that commit the most serious human rights abuses often possess the most woefully

inadequate legal mechanisms for redressing those abuses,"[374] courts have

---

[370]    *Id.* at 427.

[371]    *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80-81
(2d Cir. 2003) (quotation marks omitted).

[372]    *See, e.g.*, *Chavez*, 2009 WL 670022, at *4; *Arce v. Garcia*, 434 F.3d
1254, 1261-62 (11th Cir. 2006); *Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir.
2004). The parties agree. *See* Def. Mem. at 43; Pl. Mem. at 55.

[373]    TVPA, Pub. L. No. 102-256, preface, 106 Stat. 73, 73 (1992).

[374]    *Arce*, 434 F.3d at 1262.

uniformly held that the TVPA statute of limitations is subject to equitable tolling.[375]

In ATCA cases alleging *state-sponsored* violations of international law, courts have been especially willing to toll the statute of limitations during the time the abusive *government* remains in power.

> The quest for domestic and international legitimacy and power may provide regimes with the incentive to intimidate witnesses, to suppress evidence, and to commit additional human rights abuses against those who speak out against the regime. Such circumstances exemplify "extraordinary circumstances" and may require equitable tolling so long as the perpetrating regime remains in power.[376]

In *Arce v. Garcia*, the Eleventh Circuit held that the district court was well within its discretion to hold that the limitations period did not *begin* to run until the allegedly abusive El Salvadorian regime left power because "the record swell[ed] with evidence regarding the brutality and oppression that the Salvadoran military

---

[375]     *See id. See also Chavez*, 2009 WL 670022, at *4; *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1155 (11th Cir. 2005); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996); *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230 (D.D.C. 2005); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1550 (N.D. Cal. 1987).

[376]     *Arce*, 434 F.3d at 1263.

visited upon the people of El Salvador."[377]  The court explained:

> The remedial scheme conceived by the TVPA and the
> ATCA would fail if courts allowed the clock to run on
> potentially meritorious claims while the *regime responsible*
> for the heinous acts for which these statutes provide redress
> remains in power, frightening those who may wish to come
> forward from ever telling their stories.[378]

When equitable tolling extends the start date of the limitations period,

the courts of appeals are divided as to whether plaintiffs receive the full

limitations period once the tolling ends.[379]  The Second Circuit has not addressed

---

[377]    *Id.* at 1264.

[378]    *Id.* at 1265 (emphasis added). *Accord Chavez*, 2009 WL 670022, at
*4 ("In such limited circumstances, where plaintiffs legitimately fear reprisals
against themselves or family members from the regime in power, justice may
require tolling. These circumstances, outside plaintiffs' control, make it impossible
for plaintiffs to assert their TVPA and ATS claims in a timely manner."); *Cabello*,
402 F.3d at 1155 (tolling the statute of limitations until the Chilean military
dictatorship lost power because, up to that point, "the Chilean political climate
prevented the Cabello family from pursuing any efforts to learn of the incidents
surrounding Cabello's murder"); *Hilao*, 103 F.3d at 773 (tolling the statute of
limitations for ATCA claims against former Philippine dictator Ferdinand Marcos
until the Marcos regime was overthrown because, *inter alia*, "many victims of
torture in the Philippines did not report the human-rights abuses they suffered out
of intimidation and fear of reprisals"); *Forti*, 672 F. Supp. at 1550 (denying the
defendant's motion to dismiss an ATCA claim on statute of limitations grounds
because the complaint alleged that the "military's reign of terror" caused such a
breakdown of the Argentine legal system that the plaintiffs "were denied effective
access to Argentine courts" until the end of the military dictatorship).

[379]    *Compare Cabello*, 402 F.3d at 1156 ("[S]tatutory clock is stopped
while tolling is in effect . . . [and thus] statutory period does not begin to run until

117

this question.  In those circuits holding that plaintiffs do not necessarily enjoy the full period, plaintiffs must file their claims within a "reasonable" period after the toll expires, exercising diligence.[380]

### 2.    Relation Back

Federal Rule of Civil Procedure 15(c)(1)(B) provides, "An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities."[381]  "For a newly added action to relate back, the basic claim must have arisen out of the conduct set

---

the impediment to filing a cause of action is removed.") *and Socop-Gonzalez v. INS*, 272 F.3d 1176, 1194-96 (9th Cir. 2001) (same) *with Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1991) (holding that tolling provides only a reasonable extension of time to file). *See also Simon v. Republic of Iraq*, 529 F.3d 1187, 1195 (D.C. Cir. 2008), *cert. granted*, 129 S. Ct. 894 (2009) (noting internal D.C. Circuit conflict on the issue).

[380]     *See Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993) (holding that tolling "gives the plaintiff extra time only if he needs it"; that is, plaintiff obtains a "reasonable" extension). *See also Cada*, 920 F.2d at 452 (same).

[381]     *Slayton v. American Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (quotation marks omitted).

forth in the original pleading."[382]  Under Rule 15, the "central inquiry is whether

adequate notice of the matters raised in the amended pleading has been given to

the opposing party within the statute of limitations by the general fact situation

alleged in the original pleading."[383]  "Where the amended complaint does not

allege a new claim but renders prior allegations more definite and precise, relation

back occurs."[384]

> Rule 15(c)(1)(C) provides:
>
> An amendment to a pleading relates back to the date of the
> original pleading when the amendment changes the party
> or the naming of the party against whom a claim is
> asserted, if Rule 15(c)(1)(B) is satisfied and if, within the
> period provided by Rule 4(m) for serving the summons and
> complaint, the party to be brought in by amendment (i)
> received such notice of the action that it will not be
> prejudiced in defending on the merits; and (ii) knew or
> should have known that the action would have been
> brought against it, but for a mistake concerning the proper
> party's identity.

Rule 15(c)(1)(C) only addresses the addition of new defendants.  Nevertheless, the

Advisory Committee Note states that "the attitude taken in revised Rule 15(c)

toward change of defendants extends by analogy to amendments changing

---

[382]    *Id.* (quotation marks omitted).

[383]    *Id.* (quotation marks omitted).

[384]    *Id.*

plaintiffs." "Courts have, however, disagreed concerning precisely how to apply 'the attitude' of Rule 15(c) to amendments adding new plaintiffs."[385]   All courts agree that the notice and prejudice prongs apply, but there is disagreement concerning whether the failure originally to name the newly added plaintiff must have been the result of a mistake within the meaning of Rule 15(c)(1)(C).

In a one paragraph per curiam opinion, the Second Circuit once endorsed a district court's application of the mistake requirement to the addition of a plaintiff, but that case involved unique concerns pertaining to piggybacking employment discrimination claims.[386]   Courts in this Circuit have more recently rejected the suggestion that amendments seeking to add new plaintiffs must satisfy Rule 15(c)(1)(C)'s "mistake" requirement.[387]   Judge Jack B. Weinstein has observed that Rule 15(c)(1)(C)'s mistake requirement, "by its express language, appears not to be relevant when adding a plaintiff."[388]   "Nor is requiring the plaintiff to demonstrate a 'mistake' consistent with the liberal 'attitude' of Rule

---

[385]   *In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510, 2005 WL 2277476, at *25 (E.D.N.Y. Sept. 19, 2005).

[386]   *See Levy v. U.S. Gen. Accounting Office*, 175 F.3d 254 (2d Cir. 1999).

[387]   *See id.* (discussing cases).

[388]   *In re Simon II Litig.*, 211 F.R.D. 86, 145 (E.D.N.Y. 2002), *vacated on other grounds by* 407 F.3d 125 (2d Cir. 2005).

15, which is to permit amendment of pleadings to encourage resolution of claims on the merits."[389]

Prejudice in Rule 15 means legal prejudice, not the practical prejudice of being subject to greater awards.[390] Thus, the question is whether the late addition of a plaintiff would "'surprise and frustrate reasonable possibilities for a defense.'"[391]

### 3.   *American Pipe* Tolling

In *American Pipe & Construction Co. v. Utah*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class . . . ."[392]

> The theoretical basis on which *American Pipe* rests is the notion that class members are treated as parties to the class action "until and unless they received notice thereof and chose not to continue." Because members of the asserted class are treated for limitations purposes as having

---

[389]   *In re Gilat*, 2005 WL 2277476, at *26.

[390]   *See In re Simon II Litig.*, 211 F.R.D. at 146 (noting that an amendment is not prejudicial "if the conduct relied upon does not change appreciably, defendants' opportunity to defend is not appreciably adversely affected, and the defendant should have appreciated that the new plaintiff's claims were similar to the ones originally stated and might well be prosecuted").

[391]   *In re Gilat*, 2005 WL 2277476, at *26 (quoting *In re Simon II Litig.*, 211 F.R.D. at 146).

[392]   414 U.S. 538, 554 (1974).

instituted their own actions, at least so long as they
continue to be members of the class, the limitations period
does not run against them during that time.[393]

## B.   Discussion

### 1.   Equitable Tolling

Plaintiffs have sufficiently alleged that, through 1993, the political

climate in South Africa prevented them from gathering evidence, interviewing

witnesses, or otherwise taking the initial steps required to commence litigation.

Political killings were common through 1993.  The oppressive apartheid regime

was still in place.  Although defendants argue that the "apartheid regime had been

effectively dismantled well before" 1994, and probably in 1991,[394] it would be

inappropriate to resolve these factual disputes on a motion to dismiss.[395]

There is no need to decide whether tolling stops the statute of

limitations clock because – even if it does not – the question of whether it was

unreasonable for plaintiffs to wait until 2002 to file their claims requires factual

---

[393]     *In re WorldCom Secs. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007)
(quoting *American Pipe*, 414 U.S. at 551).

[394]     Def. Mem. at 45.

[395]     It is telling that defendants cite a law, effective on April 27, *1994*,
that dismantled a legal regime "dividing black South Africans into eight groups
and mandating that each homeland had to govern itself independently from the
white government."  Def. Reply at 30.

development.  The *Khulumani* Complaint discusses – for example – the

tremendous time and energy required for plaintiffs to file their TRC grievances.  It

is not clear that a diligent and reasonable plaintiff would have had time to

participate in that lengthy and difficult process and simultaneously to prepare a

lawsuit.  Further, defendants' refusal to participate in the TRC process made it

much more difficult for plaintiffs to amass the evidence to prosecute their claims.

A reasonable plaintiff may have assumed that defendants would participate in the

TRC process, in which case plaintiffs would have had no need to conduct an

independent investigation into defendants' conduct.  Indeed, it likely would have

been an affront to the integrity of the TRC process for plaintiffs to have conducted

an independent investigation or commenced these lawsuits while the TRC process

continued.  In short, the motion to dismiss these cases on statute of limitations

grounds is denied.[396]

### 2.    Relation Back and *American Pipe* Tolling

In remanding this case, the Second Circuit instructed this Court to

decide in the first instance whether to allow plaintiffs to amend their Complaints

in order to "narrow their claims and clarify the nature of their allegations against

---

[396]    Defendants may raise this argument again on summary judgment,
when statute of limitations defenses are more appropriately adjudicated.

the various defendants."[397]  After this Court granted plaintiffs leave to amend,

plaintiffs filed the Amended Complaints in October 2008.

Because the Amended Complaints simply clarify the nature of the

allegations, by stating more clearly what plaintiffs *attempted* to set forth in 2002,

the Complaints relate back within the meaning of Rule 15(c)(1)(B).   The

remaining question is whether the addition of new parties relates back.

There are three areas of concern.  *First*, in the *Khulumani* action, the

original Complaint was brought only by *individual* plaintiffs, whereas the

Amended Complaint is brought in the name of several proposed *classes*.  *Second*,

Fujitsu is named as a defendant in a *class* action for the first time in the amended

*Khulumani* Complaint although it had been named as a defendant by individual

plaintiffs.  *Third*, in the *Ntsebeza* action, the original Complaint named Daimler

Chrysler Corporation ("Daimler Corp.") but not Daimler Chrysler A.G. ("Daimler

A.G."), whereas the Amended Complaint names Daimler A.G. but not Daimler

Corp.  I discuss each addition in turn.

### a.    *Khulumani* Complaint: New Class

The *Khulumani* plaintiffs argue that the filing of the *Ntsebeza* action

tolled the statute of limitations for the *Khulumani* class because the *Khulumani*

---

[397]     *Khulumani*, 504 F.3d at 263.

class members were all in the *Ntsebeza* class, the *Ntsebeza* allegations put the

defendants on notice of the *Khulumani* allegations, and – with the exception of

Fujitsu – the defendants are the same.  Plaintiffs argue that "proposed class

members may file separate class actions alleging the same unlawful conduct by the

same defendants named in the original class action."[398]  Plaintiffs are right.  It

follows straightforwardly from *American Pipe*: upon the filing of the *Ntsebeza*

class action the statute of limitations period was suspended for all members of the

*Ntsebeza* class with respect to the claims made in the *Ntsebeza* action raised

against the *Ntsebeza* defendants.  Because no motion to certify the class has been

adjudicated, this toll is still in place.

### b.    *Khulumani* Complaint: Fujitsu

In *Khulumani*, there is a special problem with respect to the class

allegations against Fujitsu: although Fujitsu was named in the original *Khulumani*

action brought by individual plaintiffs, Fujitsu, unlike the other *Khulumani*

defendants, was not named as a defendant in the *Ntsebeza* action.  Thus, *American*

*Pipe* tolling does not apply.  Accordingly, the question is whether new plaintiffs

may be added to the *Khulumani* action, which named Fujitsu, in keeping with the

"attitude" of Rule 15(c)(1)(C).  Specifically, the issues are whether Fujitsu had

---

[398]    Pl. Mem. at 59.

adequate notice of the claims of the newly added plaintiffs and whether the late

assertion of their claims would "surprise and frustrate reasonable possibilities for a

defense."[399]

Regarding notice, the Amended Complaint in *Khulumani* merely

amplifies the original allegations against Fujitsu with more specific facts and adds

to the list of people who were harmed by Fujitsu's alleged conduct. The addition

of new plaintiffs does not change the nature of the allegation: that Fujitsu aided

and abetted crimes of apartheid through the creation of software designed to

facilitate apartheid control. Thus, Fujitsu has had adequate notice of the

allegations against it since the time the action was first filed.

Similarly, the addition of the class plaintiffs does not create undue

*legal* prejudice. Because the nature of the allegations is the same, the addition of

more plaintiffs does not frustrate Fujitsu's ability to prepare a legal defense. This

is especially true where – as here – there has been no discovery and the motion to

dismiss is still pending. To be sure, Fujitsu may be exposed to much greater

liability, but that does not constitute legal prejudice within the meaning of Rule

---

[399]     *In re Simon II Litig.*, 211 F.R.D. at 146.

15.[400]

### c.   *Ntsebeza* **Complaint: Daimler A.G. for Daimler Corp.**

In the *Ntsebeza* action, the issue is whether the substitution of

Daimler A.G. for Daimler Corp. in the Amended Complaint should relate back to

the original Complaint within the meaning of Rule 15(c).   For the same reasons

discussed above, the notice and prejudice prongs of Rule 15(c)(1)(C) are easily

met.  The only question is whether naming Daimler Corp. rather than Daimler

A.G. in the original Complaint was a mistake that Daimler A.G. should have

known about.  The original *Ntsebeza* Complaint incorrectly identified Daimler

Corp. as having its international headquarters in Germany.  Daimler A.G., not

Daimler Corp., is headquartered in Germany.   This is exactly the sort of mistake

that Rule 15(c) contemplates.   Further, even if plaintiffs intended to name Daimler

Corp. in 2003, the complex corporate structure of the Daimler corporations make

it difficult to hold as a matter of law that plaintiffs were not mistaken in originally

thinking that Daimler Corp. was the real party in interest.

---

[400]     For this reason, defendants' reliance on *Korwek v. Hunt*, 827 F.2d
874 (2d Cir. 1987), is misplaced.  There, the Second Circuit held that "the tolling
rule established by *American Pipe* . . . was not intended to be applied to suspend
the running of statutes of limitations for class action suits filed *after* a definitive
determination of class certification." *Id.* at 879 (emphasis added).  Here, by
contrast, there has been no determination of class certification.

## XI.   STANDING

As a final note, although defendants do not challenge the standing of

individual plaintiffs to bring these suits, defendants do contest the standing of the

Khulumani Support Group ("KSG"), an organization that brings suit on its own

behalf and not on behalf of its members.[401]   Survivors of apartheid and the families

of victims formed KSG in 1995, in response to the creation of the TRC.[402]   KSG's

"primary purpose was to ensure that the victims had the support they needed in

order to speak out about their personal experiences of human rights atrocities

committed during the apartheid regime."[403]   In 1998, KSG's activities expanded to

include outreach – such as health services and educational programs – intended to

aid the reconciliation of the victims of apartheid.[404]

### A.   Applicable Law

In order to invoke the jurisdiction of the federal courts, a party must

"satisfy the threshold requirement imposed by Article III of the Constitution by

---

[401]   *See Khulumani* Complaint ¶ 18.   *Accord* Pl. Mem. at 63 (noting that KSG does not assert associational standing).

[402]   *See Khulumani* Complaint ¶ 18.   KSG has 55,000 members who are survivors of apartheid violence; it operates seventy community-based chapters and employs eight full-time staff members.   *See id.*

[403]   *Id.*   Kulumani means "Speak Out" in Zulu.   *See id.*

[404]   *See id.*

alleging an actual case or controversy."[405]  Specifically,

> Article III standing consists of three irreducible elements:
> (1) injury-in-fact, which is a concrete and particularized
> harm to a legally protected interest; (2) causation in the
> form of a fairly traceable connection between the asserted
> injury-in-fact and the alleged actions of the defendant; and
> (3) redressability, or a non-speculative likelihood that the
> injury can be remedied by the requested relief.[406]

As a general rule, the "injury-in-fact" requirement means that a plaintiff must have

personally suffered an injury, rather than having a general grievance.[407]  "The party

invoking federal jurisdiction bears the burden of establishing these elements . . .

with the manner and degree of evidence required at the successive stages of the

litigation."[408]  Accordingly, "[a]t the pleading stage, general factual allegations of

injury resulting from the defendant's conduct may suffice."[409]

An organization "may file suit on its own behalf 'to seek judicial

relief from injury to itself and to vindicate whatever rights and immunities the

---

[405]   *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citations
omitted).

[406]   *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d
100, 106-07 (2d Cir. 2008) (quotation marks omitted).

[407]   *Id.* at 107 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560
n.1 (1992)).

[408]   *Lujan*, 504 U.S. at 561.

[409]   *Id.*

association itself may enjoy.'"[410] When an organization sues on its own behalf,

"the organization must meet the same standing test that applies to individuals by

showing actual or threatened injury in fact that is fairly traceable to the alleged

illegal action and likely to be redressed by a favorable court decision."[411]

"Conversely, 'an organization's abstract concern with a subject that could be

affected by an adjudication does not substitute for the concrete injury required by

Art[icle] III.'"[412]

In *Havens Realty Corporation v. Coleman*, the Supreme Court held

that a fair housing organization that "had to devote significant resources to

identify and counteract [the defendants'] racially discriminatory steering

practices" suffered an actionable injury in fact.[413]  The Court explained that

"[s]uch concrete and demonstrable injury to the organization's activities – with the

consequent drain on the organization's resources – constitutes far more than

---

[410]    *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir.
1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

[411]    *Id.* (quotation marks omitted) (alterations removed).

[412]    *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir.
1993) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40
(1976)).

[413]    455 U.S. 363, 379 (1982) (quoting the Complaint).

130

simply a setback to the organization's abstract social interests."[414]

In *Ragin v. Harry Macklowe Real Estate Co.*, the Second Circuit applied *Havens Realty* in holding that a fair housing organization had standing to claim that defendants' real estate advertisements violated the Fair Housing Act because the organization "devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements" through legal means and community outreach efforts.[415] This constituted a concrete injury to the organization because – in part – the legal efforts "*prevented* [some organization members] from devoting their time and energies to other [agency] matters" and the organization was thereby "forced to 'devote significant resources to identify and counteract' the defendants' advertising practices and did so to the *detriment* of their 'efforts to [obtain] equal access to housing through counseling and other referral services.'"[416] In accordance with *Havens Realty* and *Ragin*, other Circuits require "a direct conflict between the defendant's conduct and the organization's

_____

[414]     *Id.*

[415]     6 F.3d at 905.

[416]     *Id.* (quoting *Havens Realty*, 455 U.S. at 379) (emphases added). *Accord Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.").

mission."[417]

"If an 'organization' seems to have been formed specifically for the

purpose of bringing an action, standing may be denied to protect standing doctrine

against the mere will of a would-be plaintiff."[418] If standing were allowed in such

circumstances, "persons with only a 'generalized grievance[],' concededly

insufficient for standing, . . . could simply form an organization to advance their

grievance, and, whenever an agency decision offended their position, secure

standing by asserting that it had thrown practical roadblocks in the way of the

---

[417]     *Abigail Alliance for Better Access to Developmental Drugs v.
Eschenbach*, 469 F.3d 129, 132-33 (D.C. Cir. 2006). *Accord Alexander v. Riga*,
208 F.3d 419, 427 n.4 (3d Cir. 2000) ("[A] fair housing organization [has]
standing to sue if the discriminatory acts impair[] the organization's ability to
carry out its mission."); *American Legal Found. v. FCC*, 808 F.2d 84, 91–92 (D.C.
Cir. 1987) (noting that to establish injury to its own interests, the "organization
must allege that discrete programmatic concerns are being directly and adversely
affected").

[418]     13A Wright & Miller, *supra*, § 3531.9.5. *See also id.* (noting that a
contrary rule "would support a great expansion of association standing, effectively
destroying the general rule that simple interest in a problem is not sufficient to
give standing"); *Animal Lovers Volunteer Ass'n Inc. (A.L.V.A.) v. Weinberger*, 765
F.2d 937, 939 (9th Cir. 1985) ("While an organization's standing is not simply a
function of its age or fame, those factors become highly relevant when the
organization . . . has no history which antedates the legal action it seeks to bring,
and can point to no activities which demonstrate its interest, other than pursuing a
legal action.").

132

organization's success."[419]

## B.    Discussion

KSG was *formed* to counteract the specific harms that these

defendants allegedly perpetrated, and KSG has a clear "organizational stake" in

the outcome of this litigation.[420]  Nonetheless, KSG lacks standing for two reasons.

*First*, the *Khulumani* Complaint does not allege that the time and

resources KSG spent counteracting the harms of apartheid were *diverted* from

KSG projects.  Rather, because the purpose of KSG is to counteract the harms of

apartheid, efforts spent in that pursuit cannot constitute a *detriment* to the group's

mission or activities.  To be sure, the *Khulumani* Complaint may fairly be

interpreted to allege that defendants' failure to participate in the TRC process

caused KSG to expend far greater resources to vindicate the rights of its members

than it otherwise would have, to the detriment of other direct aid projects

sponsored by the group.  However, the organizational injury (so described) is not

fairly traceable to the defendants' alleged *unlawful* conduct because the alleged

tort is aiding and abetting the crimes of apartheid, not failing to participate in the

---

[419]    *Hazardous Waste Treatment Council v. U.S. EPA*, 861 F.2d 277, 286-87 (D.C. Cir. 1988) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974)).

[420]    *A.L.V.A.*, 765 F.2d at 939.

133

TRC process.

*Second*, and more important, permitting KSG's claim to proceed would effect an unwarranted expansion of the standing doctrine. KSG was formed in response to – and with the aim to remedy – the torts at issue in this lawsuit. At the time of KSG's formation, *after* the alleged torts had occurred, the group – as opposed to its members – had only a generalized grievance against defendants. A generalized grievance is insufficient to support standing. If KSG had standing, then so would any group formed to remedy a third-party's wrongs that spends significant resources in that effort. In such a jurisprudential landscape, *every* generalized grievance could be readily transformed into a concrete organizational injury. This would undermine the law of standing. Therefore, KSG's claims are dismissed.[421]

## XII. CONCLUSION

What remains of these consolidated cases is vastly different from the dozen actions first filed in 2002 and 2003. Corporate defendants accused of

---

[421]     There are alternative grounds on which KSG lacks standing. *First*, because KSG did not exist at the time of the alleged wrongs at issue, defendants could not have foreseen injuries to the organization. Thus there is an insufficient causal connection between the alleged conduct and the organizational injuries suffered by KSG. *Second*, defendants' conduct was not a proximate cause of KSG's injuries because KSG's formation was an intervening event that severed the causal chain.

134

merely doing business with the apartheid Government of South Africa have been dismissed. Claims that a corporation that aided and abetted particular acts could be liable for the breadth of harms committed under apartheid have been rejected. What survives are much narrower cases that this Court hopes will move toward resolution after more than five years spent litigating motions to dismiss.

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' motion to re-solicit the views of the Governments is denied. The following claims remain:

- *Ntsebeza* plaintiffs against Daimler, GM, and Ford for aiding and abetting torture, CIDT, extrajudicial killing, and apartheid.

- *Ntsebeza* plaintiffs against IBM for aiding and abetting arbitrary dentationalization and apartheid.

- *Khulumani* plaintiffs against Rheinmetall for aiding and abetting extrajudicial killing and apartheid.

The following claims are dismissed with leave to amend:

- *Khulumani* plaintiffs against IBM and Fujitsu for aiding and abetting apartheid.

- *Khulumani* plaintiffs against Daimler, GM, and Ford for aiding and abetting extrajudicial killing and apartheid.

135

All other claims are dismissed with prejudice, as any amendment would be futile.[422] The *Khulumani* plaintiffs may file an amended complaint by May 1, 2009.  The stay concerning Rheinmetall Group's objections to the exercise of personal jurisdiction and to improper service of process under the Hague Convention is now lifted, and Rheinmetall may file a motion to dismiss on those grounds by May 1, 2009.

The Clerk of the Court is directed to close these motions (02 MDL 1499 docket numbers 96, 99, 100, 104, 106, 110, and 115; 02 Civ. 4712 unnumbered; 02 Civ. 6218 unnumbered; 03 Civ. 1024 unnumbered; and 03 Civ. 4524 unnumbered).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 8, 2009

---

[422]      *See, e.g.*, *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("Although Fed. R. Civ. P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

136

## - Appearances -

**For Plaintiffs Ntsebeza *et al.*:**

Jay J. Rice, Esq.
Diane E. Sammons, Esq.
Nagel Rice LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Tyler R. Giannini, Esq.
International Human Rights Clinic
Harvard Law School
Pound Hall Room 401
1563 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-9362

Helen I. Zeldes, Esq.
Zeldes & Haeggquist, LLP
655 West Broadway, Suite 1410
San Diego, California 92101
(619) 995-8218

Medi Mokuena, Esq.
Mokuena Attorneys
Post Office Box 8591
1685 Johannesburg
Republic of South Africa

John Sindiso Ngcebetsha, Esq.
Gugulethu Oscar Madlanga, Esq.
Ngcebetsha Madlanga Attorneys
Post Office Box 544
2125 Randburg
Republic of South Africa

Paul L. Hoffman, Esq.
Schonbrun DeSimone Seplow Harris
  & Hoffman
723 Ocean Front Walk
Venice, California 90291
(310) 396-0731

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown
  Chomsky
Post Office Box 29726
Elkins Park, Pennsylvania 19027
(215) 782-8367

Michael Francis Osborne, Esq.
512 Keerom Street Chambers
56 Keerom Street
8001 Cape Town
Republic of South Africa

Dumisa Buhle Ntsebeza, Esq.
Duma Nokwe Group of Advocates
Fountain Chambers
Post Office Box 784845
2196 Sandton
Republic of South Africa

**For Plaintiffs Khulumani *et al.*:**

Michael D. Hausfeld, Esq.
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 579-1089

Steig D. Olson, Esq.
Hausfeld LLP
11 Broadway, Suite 615
New York, New York 10004
(646) 278-0877

Charles Peter Abrahams, Esq.
Abrahams Kiewitz
Suite 15, Canal Edge Threet
Carl Cronje Drive, Tyger, Waterfront
Cape Town
Republic of South Africa

Robert G. Kerrigan, Esq.
Kerrigan, Estess, Rankin & McLeod,
    LLP
627 East Government Street
Pensacola, Florida 32502
(850) 444-4402

Matt Schultz, Esq.
Levin Papantonio Thomas Mitchell
    Echsner & Proctor, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7140

**For Defendant UBS A.G.:**

Francis P. Barron, Esq.
Ronald S. Rolfe, Esq.
David Greenwald, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

**For Defendant International Business Machines Corp.:**

Keith R. Hummel, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

**For Defendant General Motors Corp.:**

Jayant W. Tambe, Esq.
Robert S. Walker, Esq.
Jones Day
222 East 41st Street
New York, New York 10017
(212) 326-3939

**For Defendant Barclays Bank PLC:**

Marc J. Gottridge, Esq.
Lovells LLP
590 Maidson Avenue
New York, New York 10022
(212) 909-0600

**For Defendant Fujitsu Limited:**

Mark D. McPherson, Esq.
Michael Gerard, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

**For Defendant Ford Motor Company:**

John H. Beisner, Esq.
O'Melveny & Myers LLP
1625 I Street, NW
Washington, DC 20006
(202) 383-5300

**For Defendant Daimler A.G.:**

Jerome S. Hirsch, Esq.
Susan L. Saltzstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000